Jeffry D. MARTHON and Maureen E. Kilty, Plaintiffs,

v.

MAPLE GROVE CONDOMINIUM ASSOCIATION and Alpha Property Management, Inc., Defendants.

No. 99 C 4080.

United States District Court, N.D. Illinois, Eastern Division.

June 22, 2000.

Ross B. Bricker, Eric A. Sacks, David Z. Smith, Jenner & Block, Chicago, IL, for Plaintiffs.

Michael C. Kim, Jason M. Rosenthal, Arnstein & Lehr, Chicago, IL, for Maple Grove Condominium Assoc.

Steven R. McMannon, William Yu, Tribler, Orpett & Crone, P.C., Chicago, IL, for Alpha Property Management, Inc.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Jeffry Marthon ("Marthon") and his wife Maureen Kilty ("Kilty") assert two claims against Maple Grove Condominium Association ("Maple Grove") and Alpha Property Management, Inc. ("Alpha") under the Fair Housing Act of 1968 as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601–3631.[1] Their first claim contends that defendants violated Section 3617 by interfering with Marthon's and Kilty's use and enjoyment of their condominium unit through threats, intimidation and other discriminatory actions. Their second claim says that defendants violated Section 3604 by not reasonably accommodating Marthon's Tourette's Syndrome ("Tourette's"). Under Fed.R.Civ.P. ("Rule") 56 plaintiffs have moved for summary judgment as to liability and Alpha has moved for a full summary judgment. All parties have complied with this District Court's LR 56.1(a),[2] and both motions are now fully briefed and ready for decision. For the reasons set forth in this memorandum opinion and order, plaintiffs' motion is denied while Alpha's motion is granted in part and denied in part.

### Summary Judgment Standards

Familiar Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). As *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) has more recently quoted from *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992) has said that "general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue," and that same logic extends to Housing Act cases where a housing provider is alleged to have acted with discriminatory intent. But neither "the mere existence of some alleged factual dispute between the parties" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) nor the existence of "some metaphysical doubt as to

1. Those statutes (collectively for convenience "Housing Act") will be cited "Section—," using the Title 42 number rather than the Housing Act's internal section numbering.

2. LR 56.1(a) and 56.1(b) are designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to plaintiffs' LR 56.1(a) statement of facts as "P. St. ¶—," to Maple Grove's and Alpha's LR 56.1(b)(3)(A) responses as "M. Resp. ¶—" and "A. Resp. ¶—," to Maple Grove's and Alpha's LR 56.1(b)(3)(B) statements of additional facts as "M. St. ¶—" and "A. St. ¶—," and to plaintiffs' response to those statements as "P. M. Resp. ¶—" and "P.A. Resp. ¶—." Statements of fact relating to Alpha's cross-motion for summary judgment will have similar designations with the addition of the letter "C", for example, "A. C. St. ¶—." Citations to memoranda will also use the "P.," "M." and "A." abbreviations.

the material facts" (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) will defeat a summary judgment motion.

What follows in the *Facts* section (and in later factual discussion) is culled from the parties' vast submissions,[3] beginning with an introduction to the cast and characters and followed by an account of the events at issue. And as with every summary judgment motion, this Court has accepted each nonmovant's version of any disputed facts where it is arguably supported by the record.

## Facts

Since they were married in 1986, Marthon and Kilty have lived together in Unit 309T[4] of the Maple Grove Condominiums in Downers Grove, Illinois (P. St.¶ 2). Maple Grove is responsible for administering its approximately 146 condominium units (*id.* ¶ 3), for which purpose the management authority is vested in its Board of Managers ("Board") (*id.* ¶ 5). Since the summer of 1997 Paula Beranek ("Beranek") has been Board President, and the current dispute erupted after she moved from another unit to 409T, directly above plaintiffs' unit (*id.* ¶ 7a). There are six other Board members, including Margery Schuster ("Schuster"), the sister of Marian Devereux ("Devereux") (*id.* ¶ 7b-g). Devereux is a 75 year old woman who lives directly below plaintiffs' unit in 209T (*id.* ¶ 7e).

Alpha is the property manager and acts as an agent for Maple Grove (*id.* ¶¶ 8–9). Stafford Crossland ("Crossland"), who was hired by Alpha to perform the actual management tasks, works directly with the Board (*id.* ¶¶ 10, 11). Alpha is not authorized to act on behalf of Maple Grove without instructions from the Board (A.St. ¶ 8), but it can question the legality of the Board's actions (P. St.¶ 12).

Gilles de la Tourette's Syndrome is an inherited neurological disorder typified by involuntary motor and vocal "tics" (*id.* ¶ 27). Tourette's is also viewed as a mental disorder by the American Psychiatric Association (*id.* ¶ 33). Marthon's Tourette's results in involuntary "throat clearing, 'hooting' or 'barking,' foot stomping, and, recently, rare instances of coprolalia (the vocalization of socially inappropriate words and phrases)" (*id.* ¶ 32). Marthon also suffers from a sleep-related disorder and tinnitus[5] that causes anxiety and insomnia (*id.* ¶ 37). As a result he has an abnormal sleep cycle (M.St.¶ 55). Marthon can suppress his motor and vocal tics for only a short period of time before releasing them, and stress exacerbates his condition (P. St.¶¶ 38–39). Kilty typically sleeps in a different room from Marthon, because Kilty has a snoring problem that awakens Marthon (M.St.¶ 88).

Maple Grove seeks to dispute whether Marthon is treating his Tourette's appropriately. Marthon says that he "treats his Tourette's and related disorders with regular doctor visits, medication, an exercise regimen, and meditation" (*id.* ¶ 40). On the other hand, Maple Grove states that "Marthon's medical records contain no indication of any treatment for Tourette [sic] Syndrome" (M.Resp.¶ 40) and that "conventional medications are readily available which [can] significantly reduce the severity and frequency of" Marthon's motor and vocal tics (M.Resp.¶¶ 46, 49). Maple Grove adds that Marthon's physician Brian O'Leary "is unaware of any medication used to help curb the effects of Tourette [sic] Syndrome, despite the fact that nu-

---

3. Plaintiffs present 229 "short numbered paragraphs" of "material" facts, with Maple Grove and Alpha respectively adding an additional 74 and 88 paragraphs. All told there are 391 factual statements, not including disputes revealed in the responses to the several statements.

4. From here on out that and other units will be referred to by their number and letter designations, omitting "Unit."

5. Tinnitus is the subjective sensation of a ringing or roaring in the ears.

merous such medications exist" (M. St. ¶ 80, record citations omitted). In a four-page response to that one sentence, plaintiffs assert among other things that "the medications are of limited efficacy in many patients[,] . . . have significant side effects, and because of the need to help patients feel empowered, the decision to use medications must be made by the patient" (P. M.Resp.¶ 80). Marthon has evidently taken a minimal amount of medication because of that medication's depressive effects (Dr. O'Leary Dep. 83). There are serious deficiencies in the kind of generalized basis on which Maple Grove attempts to create a genuine issue of material fact in this area—its expert did not take advantage of the opportunity that he was afforded to observe Marthon during his deposition, to enable the expert to relate his views to the facts of Marthon's situation rather than opining in such general terms on Tourette's and its treatment.

Beranek moved into 409T in September 1998, and she has heard noises from 309T on all but one or two nights since that time (Beranek Dep. 88).[6] Though there are a few times when she is able to get a good night's sleep (*id.*), she is typically awakened several times during the night and sometimes does not fall back asleep at all (*id.* 97–98). Beranek says that the noise can be heard in every room and is louder than the air conditioner in her bedroom (*id.* 97).[7] Initially she did not know the tenants of 309T, but she felt that the noises were caused by Tourette's or schizophrenia (P. St.¶ 52). Beranek states that she is "angry because I bought a piece of real estate that I cannot live in" (P. St. ¶ 139).

With the knowledge of Maple Grove's counsel, Beranek began documenting the noises emanating from 309T (M.Resp.¶ 115). Beranek's documentation included references to noises unrelated to Marthon's Tourette's (P. St.¶ 115). Beranek also recorded noises from 309T with a voice-activated dictaphone (M.Resp.¶ 117).

Even though nothing by way of complaint—either formal or informal—was ever voiced until Beranek entered the picture as an immediate neighbor of plaintiffs, Devereux has now said that six years earlier (in 1992, when she moved into 209T) she began to hear noises from 309T (M.St. ¶ 17). Those noises included hammering and stomping sounds (*id.* ¶¶ 24–25). On occasion Devereux' sister Schuster has also slept in 209T, and she has been startled and awakened after hearing noise from 309T (Schuster Dep. 98–99). After several years Devereux began to take sleeping pills in order to fall back to sleep on nights when she was awakened by noises coming from 309T (M.St.¶ 19).

As suggested in the preceding paragraph, P.M. Resp. ¶ 20 seeks to undermine Devereux' account by noting that she "did not complain to the Board . . . about the noise . . . . until after President Beranek moved" into 409T (P. M.Resp.¶ 20). Indeed, during the dozen years from 1986 until August 1998 nobody made any formal complaint to Maple Grove or Alpha, either oral or written, related to Marthon's noise (P. St.¶¶ 82–85). Devereux does say that soon after she moved in she knocked on the door of 309T to discuss the noise problem, but nobody answered (Devereux Dep. 13). Devereux says that she tried to tolerate the noise for seven years (M.St.¶ 20) and was "afraid" to complain because she

---

6. *Beranek Dep. 20 described the noises she first heard:*

> I heard the hooting, groaning, moaning. At that point I don't know if there were screams, now there are screams . . . . The footstomping, the falling of large objects . . . .

7. Although it is unnecessary to resolve this or any other factual issues in light of the result

reached in this opinion, it is significant to note for future purposes that Beranek acknowledges her "hearing is more acute than other people's because of the fact that I depend upon it more" because she has vision problems (P. St.¶ 120). Beranek suffers from a birth defect known as "coloboma in both eyes," and her right eye was enucleated five years ago (M.St.¶¶ 51–52).

perceived Marthon as being "mentally unbalanced" (P. M.Resp.¶ 28).[8] Devereux also asserts that the sounds have "escalated over the years" (Devereux Dep. 54). After Beranek raised the Marthon issue, Devereux did complain, assertedly because "it just got me down so bad I couldn't stand it anymore and I reached my limit" (Devereux Dep. 54).[9] Devereux says she is "extremely mentally irritated and physically exhausted by the noise" (Devereux Aff. ¶ 7).[10]

Dr. Daniel Wynn, who is Board-certified in the treatment of sleep disorders,[11] examined both Devereux and Beranek and concluded that Devereux suffers from chronic insomnia and severe anxiety (M.St. ¶¶ 42–44) and that Beranek suffers from severe insomnia and a significant mood disturbance, including a recurrence of depression (id. ¶¶ 64–65). In both cases Dr. Wynn says that those health problems are the "direct result" of noises coming from 309T (id. ¶¶ 44, 65). Thus he recommends that Devereux and Beranek change their present living situations if their health is to be improved (id. ¶¶ 45, 66). Plaintiffs take issue with most of Dr. Wynn's conclusions (P. M.Resp.¶¶ 43–45, 64–66).

On September 28, 1998 Beranek left a note on plaintiffs' door, stating in part (M.Resp.¶ 89):

> [E]very night since I moved in, between 3:00 a.m. and 4:00 a.m., noise from the room below me is so loud that it has awakened me. I am exhausted from the move and need a good night's sleep. I would greatly appreciate if you could be more quiet during the nighttime hours.

Kilty responded to the letter on October 1 and attributed the noise complaint to a severe cough that she had at the time (P. St.¶¶ 90–91). But Beranek replied that same day with another note, saying in part (M.Resp.¶ 95):

> Perhaps my last note was unclear. I am asking that the strange vocal sounds and the falling sounds of heavy objects be stopped immediately, especially between the hours of 10:00 p.m. and 6:00 a.m. when most people are trying to rest. If the noise does not stop after this letter, I will seek outside intervention to resolve this problem.

True to her word, when the noises continued Beranek took the issue up with the Board (Bucki Dep. 33), and an informal meeting was held between Kilty and the Board (Crossland Dep. 12, P. St. ¶¶ 96–97). At that point Kilty told Beranek and Crossland that her husband had Tourette's (M.St.¶¶ 82, 84–85).[12] Kilty says she was told that fines were a possibility if the noise continued, and Crossland was unable to refute that (Crossland Dep. 33–34). Beranek believed that Kilty would work on the problem, based on Kilty's comment that "everyone should have a good night's sleep" (P. M.Resp.¶ 86).

Then on at least several occasions[13] beginning around November 1998, the previ-

---

**8.** Devereux "thought for a long time that there was a mentally disturbed person or a crippled person [in 309T]" (P. St.¶ 53).

**9.** Devereux says that it would be "very, very hard" for her to move because she would have to sell her unit at a depressed price due to the noise from 309T (Devereux Dep. 75).

**10.** As to Beranek's predecessor as resident of 409T, former Board President Susan Carrier testified that she had heard about "problems," but the resident "didn't want to say anything because she was getting dirt cheap rent" from the owners of the unit (Carrier Dep. 17). That testimony suffers from obvious hearsay difficulties and cannot be credited for present purposes.

**11.** Dr. Wynn is currently the Medical Director of both the St. Francis Hospital Sleep Disorders Clinic in Evanston, Illinois and the Chicago North Shore Sleep Disorders Center (M.St.¶ 42).

**12.** Kilty also presented Maple Grove and Alpha with a letter from Dr. O'Leary stating that Marthon "has continued to work hard to reduce the frequency and magnitude of his noise making" (P. St.¶ 100).

**13.** It is disputed exactly how often this practice occurred (M.Resp.¶ 104).

ously quiescent Devereux banged on her ceiling with a broom handle in asserted response to Marthon's tics and noisemaking (P. St.¶ 104).[14] On January 19, 1999 Devereux left this note on the door of 309T (P. St. ¶ 106, emphasis in original):

> *STOP THE POUNDING.* Have you no respect for others?

By January 1999 all of the Board members knew that Marthon suffered from Tourette's and related disorders (P. St. ¶ 55). That same month defendants issued two "Notices of Violation" against plaintiffs based on "Witness Complaint" forms completed by Beranek and Devereux (P. St. ¶ 113).[15] According to plaintiffs, the notices were based on a provision of Maple Grove's bylaws entitled "Nuisances" (*id.* ¶ 114): [16]

> No noxious or offensive activity shall be carried on in any Unit or in the Common Elements, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to the other Unit Owners or Occupants.

Though a hearing on the matter was set for January 26, on January 20 plaintiffs' counsel sent defendants a letter explaining that Marthon suffered from Tourette's and should not be penalized or threatened because of the noises he makes involuntarily (P. St.¶ 57). That letter went on to say

that defendants should withdraw the Notices of Violation because they violate the Housing Act and requested that defendants cease "any and all threats, harassment or other forms of intimidation directed towards Ms. Kilty or Mr. Marthon" (*id.* ¶ 143). Plaintiffs also sent a letter to Devereux explaining Marthon's condition and stating that stress, particularly from Devereux pounding on the ceiling, exacerbated that condition (*id.* ¶ 58).[17] No hearing was held, and no fines resulted from the Notices of Violation. To date plaintiffs have not paid any fines (M.St.¶ 1).

Soon thereafter the Board decided to look for acoustical consultants "to determine a solution for the noise transmission between units" (P. St.¶ 145). It initially hired James Yerges ("Yerges") of Yerges Acoustics (*id.* ¶¶ 146–149). On February 16, 1999 Yerges, with Crossland present, conducted tests in Beranek's and Devereux' units and concluded that "[o]ther sounds including nearby traffic, aircraft and train noises were louder" (P. St. ¶ 152).[18] Even though Yerges had already conducted those tests, defendants sent plaintiffs' counsel a letter on February 25, 1999 stating that two acoustical consultants were "being considered" by the Board: Yerges and Shiner & Associates ("Shiner") (P. St.¶ 162). Defendants did

---

14. In a December 30, 1998 letter from Devereux to Beranek, Devereux recited her "solution" to the noise problem (P. St. ¶ 105, emphasis in original):

> I take a broom handle and pound it on my ceiling—the noise stops. *Not* a good solution, I admit.

15. It is disputed whether the Witness Complaint forms were filed with Alpha or the Board (P. A.Resp.¶ 35). It is not disputed, however, that when a resident complains, Alpha processes the complaint and sets up a hearing with the Board, from which the Board determines "the truth as to the complaint" and whether a violation has occurred (A.St.¶¶ 36, 40).

16. Alpha admits that point (A.Resp.¶ 114), but Maple Grove claims that the notices "were

based on noise complaints filed by two unit owners" and not on the "Nuisances" bylaw (M.Resp.¶ 114). That disclaimer is puzzling—if the asserted violation was not of the "Nuisances" provision, just what was assertedly violated? One is reminded of Justice Holmes' "brooding omnipresence in the sky."

17. Presumably the letter was sent to Devereux, with no similar letter going to Beranek, because the latter as Board President was already intimately familiar with the situation.

18. M. Resp. ¶ 152 disputes that conclusion because Yerges did not complete his testing. Yerges confirmed that "[b]efore we completed our engineering investigation, we withdrew from the matter" (Yerges Dep. 69)—see the next footnote. But to "dispute" his conclusion on that score, without more, is simply to raise an evidentiary red herring.

not mention that Yerges had already been retained by Maple Grove (P. St.¶ 163). Then on April 5, 1999 Alpha sent plaintiffs' counsel a letter saying that the Board had decided to retain Shiner to conduct acoustical testing on the noises originating in 309T. Again no mention was made of Yerges' prior testing (P. St.¶¶ 168–69).[19]

In the early morning of April 13, 1999 Devereux was "shocked out of sleep by three crashing blows to [her] bedroom ceiling" (M.Resp.¶ 108). In response Devereux "rapped" on the ceiling with a broom handle (P. St.¶ 108) and posted another note on plaintiffs' door (M. Resp. 107, emphasis in original): [20]

> It is 4 AM and if you do not STOP THE NOISE I am going to call the police. My health is at stake from *years* of lack of sleep due to loud thuds, cracking noises and vocal sounds above my bed. These intolerable intrusions will not be tolerated any longer.

On April 22 Brian Homans ("Homans"), an acoustical engineer with Shiner, conducted a series of acoustical tests in 209T and 409T of sounds coming from 309T

(M.St.¶¶ 93, 97–98). Plaintiffs hired acoustical engineer Richard Talaske ("Talaske") to monitor the tests (*id.* ¶ 100). Shiner's final report on the testing stated (Shiner Report at 2):

> Cracking at the intersection of precast planks and at the room perimeter was observed in the ceiling of all units that were visited.... During... testing, severe sound leakage was observed in the master bedrooms of from [sic] 309 to 209 and 309 to 409. A substantial reduction in sound level was obtained by applying masking tape to a ceiling joint in 309. Similar application of tape to the 209 ceiling resulted in a minor sound level reduction during testing.[21]

Although the report made numerous recommendations to reduce the noise,[22] it concluded that those measures "will not adequately attenuate or mask the offending noises" (Shiner Report at 5). In similar terms, the report stated that even though noise could be reduced "it is likely that residents in units 209 and 409 will still find the emitted noises to be annoying, particularly at night" (Shiner Report at 4).[23] Ta-

---

**19.** Plaintiffs assert that "[t]he Board rejected Mr. Yerges because of the results he had already found and because he was unwilling to be involved in litigation" (P. St. ¶ 170, though no record cite is given for the first proposition). Though Maple Grove seeks to dispute that and to put its own spin on the matter, the actual evidence on the issue (Yerges' deposition testimony) confirms that he withdrew from the project before completing his work (1) because the Board had brought Shiner into the matter (Dep.62), (2) because that decision had been made on the advice of Maple Grove's attorney (*id.*) and (3) because Yerges wanted no part of litigation, which he came to believe the parties had no desire to avoid (*id.* 62–63). It is clear from the experienced counsel work on everyone's part in this litigation that meticulous care has been given to the LR 56.1 components of the submission. Where as here Maple Grove has really not responded as to its reason for shifting from Yerges to Shiner *before* the former withdrew, the inference reflected in P. St. ¶ 170 is certainly reasonable—and it has been countered by nothing to support a contrary inference.

**20.** P. St. ¶¶ 107–08 describes these events in reverse order, with the letter being posted on

April 12 and the rapping of the broom handle on April 13. But it appears from Devereux' April 15, 1999 letter to plaintiffs' lawyer Ross Bricker that the note—though dated April 12—was posted on the 309T door in the early hours of April 13, after Devereux was startled from her sleep.

**21.** In May 1999 Maple Grove paid to fix cracks in the floor of Beranek's unit and in the ceiling of Devereux's unit. After those cracks were sealed, Beranek said that the noise "daily-wise... is much softer" but that she does not necessarily wake up less (Beranek Dep. 132).

**22.** Those recommendations included both structural alterations and "sound masking": increasing the ambient sound level (Shiner Report at 4–5).

**23.** Though P. St. ¶ 179 says the quoted language was "proposed by defendants' counsel," report author Homans says that is "possible, but I don't think it was" (Homans Dep. 103–04).

laske does not disagree with that general conclusion (Talaske Dep. 42).

Nevertheless, the effectiveness and appropriateness of several options are disputed. For example, plaintiffs assert that Beranek refuses to sleep either with earplugs or with a "white noise" machine (P. St.¶¶ 122–23). Maple Grove responds that both of those options are ineffective and, because of Beranek's vision problems, inappropriate (M.Resp.¶¶ 122–23).[24] Maple Grove also intimates that the proper solution is for plaintiffs to leave,[25] citing the statement "[n]oise and neighbors often don't mix" in the Tourette Syndrome Association's "Guide to Housing for Adults with Tourette Syndrome" (M.St.¶ 138).[26] Maple Grove also states, though plaintiffs dispute, that if Beranek or Devereux or both move out the noise problem will still remain "in the affected units" (M.St.¶ 152). There is of course a good deal of irony in the suggestion that a situation that had posed no disclosed difficulties for a dozen years until someone with admittedly hypersensitive hearing became an immediate neighbor should be met by calling for plaintiffs—and not that new neighbor—to move.

On May 13, 1999 Maple Grove forwarded a copy of the Shiner Report to plaintiffs' counsel and requested their thoughts and suggestions within 30 days (M.Resp.¶ 184). No response was made

within that time period (id.).[27] Then on June 15, 1999 Alpha sent a letter to Marthon and Kilty ("Termination Letter") stating that Maple Grove had "terminate[d] [their] rights to continue as Unit Owners and to continue to occupy, use or control Unit 309T" (P. St.¶ 181). That letter said the "termination is the result of the continuing violation" of the "Nuisances" bylaw (id. ¶ 182).[28]

On June 18, 1999 Maple Grove brought the "Eviction Action" against Marthon and Kilty in the Circuit Court of DuPage County, seeking the judicial sale of 309T or, alternatively, an injunction preventing plaintiffs from disturbing other unit owners (M.St.¶ 125, P. St.¶ 185).[29] Maple Grove's Eviction Action alleges that the noises caused by Marthon's Tourette's "constitute offensive activity which has become an annoyance or nuisance to other Unit Owners or Occupants, in violation of" the "Nuisances" bylaw (Eviction Action Complaint ¶ 17). It also asserts that Devereux's and Beranek's health has suffered as a result of Marthon's Tourette's (id. ¶ 16, M. St. ¶ 128). Maple Grove characterizes the Eviction Action as a "last resort, and only after never receiving any response whatsoever from Plaintiffs' counsel regarding the" Shiner Report (M. St. ¶ 132, record citations omitted).[30]

---

24. Homans stated that ear plugs would not be effective in blocking low frequency sounds such as foot stomping (M.St.¶ 109) and Devereux testified that she tried to use earplugs but, because she also suffers from tinnitus, "it makes it much worse" (Devereux Dep. 39).

25. That argument amounts to: "People who throw stones—even involuntarily—should not live in glass houses."

26. Although that same guide recommends that persons with Tourette's "choose an apartment that has as few common walls as possible" (M.St.¶ 140), plaintiffs respond that the guide was published in 1991 and that Marthon is not legally obligated to follow its suggestions in any event (P. M.Resp.¶ 138).

27. Kilty did testify that, based on viewing only a portion of the report, she thought the struc-

tural modifications were going to be implemented (Kilty Dep. 63–64, P.M. Resp. ¶ 123).

28. Where does that leave Maple Grove's purported disclaimer referred to in n. 16?

29. This action happened to be filed by Marthon on the same date, but it is obvious from the Complaint that Marthon and his lawyers were unaware of the Eviction Action (indeed, although it does not matter, the papers in this Court's possession do not show which action was filed first).

30. P.M. Resp. ¶ 132 (record citations omitted) disputes that assertion:

Defendants could have done many other things instead of filing a lawsuit. They could have contacted plaintiffs. They could have made changes to the building, and implemented all or portions of the acousti-

But defendants' offensive (as contrasted with defensive) efforts did not end there. On July 1 they sent a letter to all Maple Grove unit owners as to both this action and the Eviction Action (P. St.¶ 190). That letter said this action "may necessitate an increase in [Maple Grove's] assessments," but it did not make a similar statement about the Eviction Action (P. St. ¶¶ 195–96). In August 1999 defendants circulated an "update letter" to Maple Grove unit owners as to the status of the lawsuits (P. St.¶ 199) that plaintiffs label a one-sided propaganda campaign by Beranek (*id.* ¶¶ 200–05, 207, 213–16).

To this day plaintiffs say they "fear[ ] incurring substantial fines and the possibility of eviction because of Mr. Marthon's Tourette's" (P. St.¶ 218). In that regard, however, an agreed order entered by this Court on July 19, 1999 ("Agreed Order") commits defendants until the resolution of this case not to pursue any actions against plaintiffs, including fining them or pursuing the Eviction Action. Plaintiffs voice a number of other grievances:

1. "As a result of defendants' actions...that their actions both outside and inside their condominium unit are monitored and recorded" (P. St.¶ 220).

2. Because of Beranek's documenting of noises from 309T, plaintiffs "no longer have private conversations in their bedroom" (*id.* ¶ 221).

3. While Marthon has consciously suppressed his motor and vocal tics (*id.* ¶ 219) because of the fear of monitoring, the "fear and anxiety" of defendants' actions "has exacerbated Mr. Marthon's Tourette's and related disorders so that

Mr. Marthon...suffers more frequent and more violent motor and vocal tics" (*id.* ¶ 222).[31] Kilty says that she has never seen Marthon's motor and vocal tics as loud or as frequent (*id.* ¶ 228).

To summarize the parties' views of the facts, plaintiffs perceive Beranek as a hyper-sensitive "obsessive" woman who has abused her position as President of the Board, is insensitive to Marthon and is unwilling to use a white noise machine to drown out the noise.[32] In contrast, defendants paint a picture of Beranek and Devereux as two sleep-deprived women who have been patient while enduring many sleepless nights and a picture of Marthon as a person who has not been properly treated for his Tourette's. While plaintiffs view Maple Grove and Alpha's tactics as harassment, defendants say they are merely following valid procedures to deal with a legitimate problem.

### *Plaintiffs' Motion*

#### Count I: Section 3617

*Bronk v. Ineichen,* 54 F.3d 425, 428 (7th Cir.1995) observes that the Housing Act "is worded as a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." Section 3617 is a key provision to that end:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right grant-

---

cal engineer's recommendation. They could have left Mr. Marthon alone.

**31.** P. St. ¶ 224 says that Marthon "can no longer use his condominium unit as a place to 'relax,' where he can 'release' his motor and vocal tics so that he can be as comfortable as possible in public."

**32.** P. Mem. 2 characterizes the dispute in these terms:
[Plaintiffs'] peace came to an end after...Beranek, began residing above

[them]. Just days after moving in, President Beranek initiated a campaign of threats, intimidation, and harassment that crescendoed in [Maple Grove] filing an action to expel Mr. Marthon and Ms. Kilty from their unit. Defendants claim justification in their actions because Mr. Marthon's Tourette's causes him to engage in involuntary vocal sounds and body movements...that are sometimes "noisy."

ed or protected by section 3603, 3604, 3605, or 3606 of this title.

In turn the relevant provision of Section 3604, incorporated by reference into Section 3617, prohibits housing-connected discrimination because of a person's handicap.

To return to Section 3617, of course Marthon is asserting his own rights, while Kilty seeks to invoke the statutory provision that protects those who encourage or assist others in protecting their own rights. But both types of claims involve the same substantive standards—to which this opinion now turns.

One essential element of a Section 3617 claim in those terms is a showing of intentional discrimination on account of the handicap at issue. And under the Housing Act a plaintiff "may establish that a defendant had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test" (*Kormoczy v. Secretary, United States Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir.1995)). Toward that end P. Mem. 6 states that "defendants view Mr. Marthon with remarkable prejudice" and cite as support several "solutions" to the noise problem suggested by Maple Grove residents and Board members. For one thing, plaintiffs point to Schuster's flippant statement (Dep.69) that Marthon should "go around with pillows on his feet and a gag in his mouth...." [33] Other proposed "solutions" reflect the belief that Marthon should move out—in that regard, Alpha's Crossland would magnanimously allow Kilty to stay, but Beranek does not share that

"generosity" because Marthon might then visit Kilty too often. Still another "solution" would place Marthon in an institution.

Those and other evidentiary matters adduced by plaintiffs would surely permit a reasonable factfinder to infer the requisite discriminatory intent as having fueled defendants' actions. But for plaintiffs to succeed on their Rule 56 motion, they must also show that to be the only reasonable inference.[34] And if the same reasonable factfinder were to accept unflinchingly all of defendants' proffered reasons for their conduct, it could rationally conclude that the identical actions would have been taken even if Marthon were not a Tourette's sufferer.

To be sure, the fact that plaintiffs lived peacefully in their condominium unit until Beranek moved into 409T may well pose problems for defendants at trial. Moreover, defendants' insistence that Marthon cannot expect to be untouchable because of his Tourette's condition cannot deflect attention from the countervailing factor that Beranek is abnormally sensitive to noise[35] (an element that could be linked in the factfinders' view with the Yerges findings and with the circumstance that Maple Grove quickly switched to another acoustical "doctor" and obtained a different diagnosis). And there is also the complicating factor that Marthon's manifestations of the disturbing consequences of Tourette's have been seriously exacerbated by defendants' actions, so that a material part of the claimed harms to Beranek (and Devereux, if her testimony is credited) could be viewed by a jury as self-inflicted.

---

33. But that statement was immediately followed by this exchange (*id.*):

Q: So you believe Jeff Marthon should be gagged?

A: No, of course not. I am just saying it makes sense that if you can subdue a noise, it's not going to be intolerable for anyone.

34. As in *Byrd v. Brandeburg*, 922 F.Supp. 60, 63 (N.D.Ohio 1996), it is entirely appropriate to use the *McDonnell Douglas* burden-shifting analysis when it is the plaintiff who brings the

summary judgment motion. See also *Hemisphere Bldg. Co. v. Village of Richton Park*, No. 96 C 1268, 1998 WL 100291, at *3 n. 3 (N.D.Ill. Feb. 12,1998).

35. Nothing suggests that such sensitivity rises to the level of a disability, as Marthon's Tourette's unquestionably does. And as *Bronk*, 54 F.3d at 428 confirms, disability is the focus of the Housing Act's goal of equalized housing opportunities.

■ But all of this is classically for resolution by a factfinder, not by this Court as a matter of law. Just as cases such as *Turgeon v. Premark Int'l, Inc.*, 87 F.3d 218, 220 (7th Cir.1996) teach in the Title VII context, the ultimate issue of "[d]iscriminatory intent is a question of fact...." Similarly, *Bronk*, 54 F.3d at 430, while reversing the district court in a Housing Act case because of improper jury instructions, did not dispute that the ultimate issue of discrimination is an "appropriate question for the jury." And see also *Frazier v. Rominger*, 27 F.3d 828, 832 (2d Cir.1994), stating in another Housing Act case that when a defendant has proffered a "subjective justification[ ]" that might be "a sham, camouflaging nothing more than an animus towards [protected persons], ...it is peculiarly and rightfully the province of the fact-finder to determine a defendant's true reasons for the adverse action."

It may be appropriate to say a few words about the Eviction Act and Maple Grove's reliance on the "Nuisances" bylaw as its gravamen. Plaintiffs seek to emphasize the provision of the bylaw that prohibits conduct that "either willfully or negligently...may be or become an annoyance or nuisance to the other Unit Owners or Occupants." Because that too poses an evidentiary issue to be evaluated in the context of trial (does the fact that Marthon's Tourette's-produced conduct is plainly neither "willful" nor "negligent" indicate that Maple Grove's reliance on the bylaw is a pretext for discrimination?), this opinion does not seek to resolve the issue.

But to return directly to the subject at hand, what has been said up to now compels the denial of summary judgment and the deferral of final resolution of plaintiffs'

Count I claim until trial. This opinion turns then to the Count II claim.

*Count II: Section 3604*

Section 3604(f)(1) makes it unlawful:

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of...a person residing in or intending to reside in that dwelling after it is so sold, rented or made available.

And as *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995)(quoting Section 3604(f)(3)(B), brackets in original) confirms:

Discrimination covered by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped] person[s] equal opportunity to use and enjoy a dwelling."

In referring to that language, *Bronk*, 54 F.3d at 428 says:

Two adjectives, "reasonable" and "necessary," figure prominently in this definition, modifying both the term "accommodations" and [a defendant's] obligations under the law.

Finally, as might be expected from the statutory term itself, determining the reasonableness of any accommodation "requires, among other things, balancing the needs of the parties involved" (*United States v. Village of Palatine*, 37 F.3d 1230, 1234 (7th Cir.1994)).[36]

On plaintiffs' side, their Mem. 10 urges that in this case a reasonable accommodation is simply for "defendants [to] cease their threats of fines and eviction."[37] At least in part, plaintiffs are asking Maple

---

36. Cases from our Court of Appeals deal with claims under the quoted portion of Section 3604 without inquiring into whether a discriminatory intent is at work (see, e.g., *Erdman v. City of Fort Atkinson*, 84 F.3d 960, 962–63 (7th Cir.1996)). This opinion will similarly launch directly into the reasonable accommodation inquiry.

37. P. Mem. 10 also says that "Defendants must provide plaintiffs with a reasonable accommodation in defendants' rules, policies, practices, or services."

Grove to construe its bylaw (upon which the Eviction Action is premised) in such manner as to accommodate Marthon's Tourette's. As indicated earlier, that approach is less problematic than plaintiffs' total hands-off position, because it simply seeks (1) application of a normal rule of construction that the terms "either willfully or negligently" apply to each type of conduct addressed in the bylaw and (2) the recognition that Marthon's Tourette's-caused conduct is neither willful nor negligent.

But it is plain that plaintiffs' position goes beyond a mere issue of language construction (for example, Maple Grove might take steps to amend its bylaw). More fundamentally in the context of this case, plaintiffs contend that Marthon's disability makes it "reasonable" as a matter of law to bar any adverse action against plaintiffs even if the manifestations of the Tourette's disability negatively impacts the health of other residents such as Beranek and Devereux. And obviously, that position potentially implicates the limiting provision of Section 3604(f)(9):

> Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals. . . . [38]

■ On that score P.R. Mem. 13 asserts that "Mr. Marthon's accommodation request cannot be deemed 'unreasonable' because two sleep-sensitive neighbors object to the 'noise' from his disability." It may be true, as stated earlier, that Beranek's abnormal sensitivity to sound (and perhaps Devereux' preexisting medical problems) may be viewed by a factfinder as disqualifying factors in those terms—and that balancing determination (see *Village of Palatine*, 37 F.3d at 1234) may also be affected by the jury's evaluation of such factors as Beranek's latecomer status (should she be able to come in, saddled with her own problems, and compel the existing unit owners to move out?) and as Devereux' lack of any complaints for so many years.

But to identify such possible resolution of disputed issues by a factfinder itself recognizes that a reasonable accommodation "determination properly belongs to the jury, which is free to consider all of the evidence—the defendant's costs, the plaintiffs' benefits, the credibility of parties' assertions as to each—in reaching a decision" (*Bronk*, 54 F.3d at 430). To that end an "accommodation must facilitate a disabled individual's ability to function, and it must survive a cost-benefit balancing that takes both parties' needs into account" (*id.* at 431).

There is no need to elaborate further. As was true of plaintiffs' Section 3617 claim, their Section 3604 claim is not a good candidate for Rule 56 resolution. Instead the need to draw all reasonable factual inferences in defendants' favor compels the denial of plaintiffs' motion in favor of the resolution of that claim at trial.

### *Alpha's Cross–Motion*

Unlike the need to draw all reasonable pro-defendant inferences on plaintiffs' just-denied Rule 56 motion, Alpha's cross-motion requires an equivalent pro-plaintiffs stance. As against that, of course, Alpha's activities have been more limited than Maple Grove's. Thus, for example, it was Maple Grove and not Alpha that filed the Eviction Action.

Here are the purportedly less extensive "discriminatory acts" that P.C. Mem. 10 (record citations and footnote omitted) ascribes to Alpha:

> The Property Manager [Alpha] here did more than follow the Association's orders. The Property Manager threatened Mr. Marthon and his wife with

---

**38.** That language, however, should be "narrowly construed." To that end, "[r]estrictions predicated on public safety cannot be based on blanket stereotypes about the handicapped, but must be tailored to particularized concerns about individual residents" (*Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir.1995)).

fines. It told her that she could stay if Mr. Marthon left. It issued notices of violation. It hired and encouraged Mr. Yerges to test secretly Mr. Marthon. The Property Manager sent plaintiffs a letter purporting to terminate their rights as unit owners at the Maple Grove Condominiums. And, the Property Manager distributed an intentionally deceptive story of this lawsuit to enrage the ownership against Mr. Marthon. Those are all discriminatory acts against Mr. Marthon and Ms. Kilty.

Each side is guilty of a level of hyperbole in addressing those matters. For its part, Alpha advances a sort of Teflon defense: Because it acted as Maple Grove's agent, it is insulated from liability for all of its actions taken at the direction—or even on behalf of—its principal. On the other hand, plaintiffs reject outright what they perceive as a sort of Nuremberg defense ("I was only following orders"): In material part (though not solely) P.C. Mem. 6 points to Maple Grove's conduct as wrongful and then targets Alpha for not having exercised its right under the management contract and its asserted duty under law to question the legality of that conduct:

> It was obligated to speak up when the Board engaged in its wrongful conduct. But not only did the Property Manager avoid speaking up, it did not even question the legality of any action taken against plaintiffs, even though it normal-

ly questions the legality of every action.[39]

■ In fact the truth—"truth" in the limited sense of a Rule 56 motion, where the nonmovants (in this instance plaintiffs) are entitled to the most favorable view of the evidence, coupled with all reasonable favorable inferences—lies somewhere between those perspectives. Myriad cases extend Housing Act liability to non-innocent agents as well as their principals (plaintiffs cite *Green v. Century 21*, 740 F.2d 460 (6th Cir.1984) as exemplary of that principle, and that case is by no means alone in so holding).[40] And in this instance a reasonable factfinder could view Crossland's statements and actions as supporting an adverse ruling as to Alpha (not just by a kind of untenable topsy-turvy respondeat inferior notion). That prospect requires the denial of Alpha's Rule 56 motion.

■ That then keeps plaintiffs' Section 3617 claim against Alpha alive. But the same is not true as to the Section 3604 failure-to-accommodate claim. On that score Alpha is not involved in any way with the Eviction Action, so that the only accommodation request that potentially applies to it is to stop the threats of fines and of eviction, a request that speaks to the future.[41]

In that respect Alpha itself is without power to issue fines or to terminate plaintiffs' housing rights,[42] and the Agreed Or-

---

**39.** In those respects plaintiffs primarily attack Alpha's failure to question the legality of issuing the Notices of Violation to plaintiffs (P. A.Resp.¶ 37). In like fashion, while it is not disputed that the Board and not Alpha decided to file the Eviction Action and to send plaintiffs the Termination Letter, plaintiffs assert that Alpha should have questioned the legality of those decisions (P. A.Resp.¶¶ 48, 51, 52, 53).

**40.** For present purposes, given plaintiffs' entitlement to the most favorable view of the facts, there is no need to repeat (or to parse) the numerous other cases on which plaintiffs rely.

**41.** Plaintiffs' proposed reasonable accommodation is "that defendants cease their threats of fines and eviction" (P. Mem.10). No fines have been issued to date (M.St.¶ 1), and the Eviction Action was filed and is controlled by Maple Grove.

**42.** A.C. Reply 7 n. 2 (record citations omitted, emphasis in original) reflects the undisputed facts:

> Alpha does not adjudicate the Notices of Violation sent to owners and residents, nor does Alpha decide what, if any, penalties to issue when the Board decides that a violation has taken place. Alpha does not discriminate when it issues a Notice of Violation and will issue one when *any* owner or resident files a written complaint.

der between the parties prevents Maple Grove from directing Alpha to do either. Finally, if this Court were ultimately to order Maple Grove to withdraw the Notices of Violation, Alpha would of course have no choice but to comply. In sum, there being no factual matters in dispute, Alpha's Rule 56 motion on plaintiffs' Section 3604 claim is granted.

*Conclusion*

When "[t]he record and all reasonable inferences that may be drawn from it are viewed in the light most favorable to" the respective nonmovants, as they must be (*Jovanovic v. In–Sink–Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 898 (7th Cir.2000)), it cannot be said that no reasonable juror could find for either set of nonmovants except as to plaintiffs' Section 3604 claim against Alpha. In all other respects there are genuine issues of material fact at each level of this litigation. Plaintiffs' motion is therefore denied, while Alpha's motion is denied as to plaintiffs' Section 3617 claim and granted as to plaintiffs' Section 3604 claim. This action is set for a status hearing at 9 a.m. July 5, 2000 to discuss such further procedures as are required to lead to a swift trial.