**Xiangyuan (Sue) ZHU, Plaintiff,**

v.

**COUNTRYWIDE REALTY, COMPANY, INC., et al., Defendants.**

No. CIV. A. 00–2290–KHV.

United States District Court, D. Kansas.

Aug. 10, 2001.

David S. Whinery, Lawrence, KS, Xiangyuan Sue Zhu, Topeka, KS, pro se, for plaintiff.

Thomas G. Lemon, Todd D. Powell, Fisher, Cavanaugh, Smith & Lemon, P.A., Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Xiangyuan (Sue) Zhu brings suit against Countrywide Realty, Company, Inc. ("Countrywide"); Wittmer Farm Realty Company, Inc. ("Wittmer"); Bunting Appraisal Services; and individual defendants Marc E. Bunting, Robert Thomas and Candace Thomas. This matter comes before the Court on its Order To Show Cause (Doc. # 148) filed May 30, 2001, defendants' Motion For Summary Judgment (Doc. # 113) filed April 11, 2001 and plaintiff's Motion To Strike The Deposition Transcript Of Xiangyuan (Sue) Zhu At-

tached To Defendants' Motion For Summary Judgment (Doc. # 140) filed May 21, 2001. After carefully considering the parties' arguments and authorities, the Court is ready to rule.

## Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.[1]

Plaintiff, a single mother, is a first time homebuyer. She works full time as a senior risk analyst at Federal Home Loan Bank of Topeka. On June 12, 1998, plaintiff entered into a real estate contract with Todd and Leslie Hansen to purchase a home at 2918 S.W. Gainsboro Road in Topeka, Kansas. Robb McDowell of Greenbrier Realtors represented plaintiff as the buyer's agent. Marc Bunting of Countrywide served the Hansens as the listing agent. Bunting is a licensed real estate agent and appraiser, authorized to conduct business in Kansas. During the real estate transaction, Bunting acted solely in his capacity as a real estate agent with Countrywide.[2] Wittmer was not involved in any of the transactions involved in plaintiff's complaint.

On June 13, 1998, plaintiff signed the real estate contract, which stated that she agreed to accept the property "as is," so long as the inspection revealed that all necessary repairs could be made for less than one per cent of the purchase price.[3] If the repairs exceeded one per cent, plaintiff had the option of accepting the property "as is" or cancelling the contract. The seller could keep the contract in force,

---

1. Plaintiff purports to controvert almost all of defendants' factual statements but she does not cite portions of the record which demonstrate either that the facts are controverted or that the facts are as she claims they are. See Plaintiff's Statement Of Uncontroverted Facts in Memorandum In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment (Doc. # 126) filed May 4, 2001("Plaintiff's Opposition Memorandum") at ¶ 2 20, 22–24, 27, 29–32, 35, 37–38, 40–44. Under D. Kan. Rule 56.1, the party opposing facts "shall refer with particularity to those portions of the record upon which the opposing party relies." Plaintiff has not complied with this rule. Therefore, under D. Kan. Rule 56.1, "[a]ll material facts set forth in the statement of the movant[s] shall be deemed admitted for the purpose of summary judgment." Plaintiff has substantially complied with D. Kan. Rule 56.1, however, in advancing facts which are not set forth in movants' memorandum. To the extent that her additional facts are supported by cited record references, they may be sufficient to contradict defendants' statement of facts and raise genuine issues of material fact.

The Court notes, however, that plaintiff's affidavit is replete with conclusory allegations that lack evidentiary support. For example, plaintiff asserts that Wittmer authorized Bunting to make factual representations about the property. See Plaintiff's Statement of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶ 9. Aside from a conclusory allegation in her affidavit, plaintiff cites no record support for this assertion. To set forth a genuine issue of material fact, plaintiff's affidavit must be based upon personal knowledge and set forth facts that would be admissible in evidence. In other words, conclusory and self-serving affidavits are not sufficient. See *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991) (citing Fed. R.Civ.P. 56(e); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989)). The Court therefore disregards such statements. See Plaintiff's Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶ s 9, 19, 22, 23, 24, 40, 61, 77, 83, 87–91, 93–94, 96 and 98–99.

2. While plaintiff states that Bunting sold her the home, the record is clear that he was the listing agent and not the seller.

3. The contract defined the term "as is" to mean the home's " 'present existing condition' without warranty except for warranties specifically implied by Kansas law or expressly set forth in this Contract." See Exhibit G in Memorandum In Support Of Defendant's [sic] Motion For Summary Judgment (Doc. # 114) filed April 11, 2001 ("Defendants' Support Memorandum").

however, by agreeing either to complete repairs or replacements in excess of the cap, or to reimburse plaintiff for excess repair costs, on or before the date of closing.[4] The purchase price of the home was $113,000, and one per cent of that amount was $1151.05. An inspection report revealed that needed repairs would cost $2105.00. Plaintiff was concerned about the upkeep of an older home and, under the real estate contract, she was not obligated to purchase it.

On June 30, 1998, plaintiff told McDowell, her real estate agent, that she did not want to buy the home and that she no longer wanted him to represent her. That same day, Bunting called plaintiff at work. Since she had bumped out other offers, he threatened to sue her for $114,000 if she did not buy the home. Plaintiff did not have a copy of the real estate contract, and Bunting did not tell her that she had no contractual obligation to buy the home since the needed repairs were more than one per cent of the purchase price. Indeed, Bunting visited plaintiff at work later that day and told her that he would sue her for $114,000 if she did not purchase the home. He did not believe or intend, however, that his actions would harass, coerce, pressure, intimidate or in any way force plaintiff to buy the home.

The following day, July 1, 1998, plaintiff met Bunting at the home. According to plaintiff, Bunting insisted that she close the transaction the next day, July 2, 1998.

Because she was worried about taking care of the house if anything went wrong, plaintiff asked Bunting whether he knew of any other defects and whether he would fix the items listed on the inspection report if she purchased the home. According to plaintiff, Bunting replied that he would take care of the house and that she did not need to know anyone else in Topeka. When Zhu asked Bunting how could she trust him since she did not know him and had never been to his office, Bunting told her that he was different from other realtors and that he would keep his promise because he had been in business for more than 20 years and owned his own company. Plaintiff purchased the property and the sale closed on July 2, 1998. On that date, Bunting gave plaintiff a signed note that stated:

> The following items will be completed on the property located at 2918 S.W. Gainsboro Road in Topeka, Kansas on behalf of Xiang Yuan Zhu and will be the responsibility of Marc E. Bunting.
>
> Install new microwave provided by Ms. Zhu. 1 days [sic] notice needed for installation. Paint and attach batt board to bottom edge of siding on south side of house. Work will be done no later than July 10th on the batt board.

See Exhibit H in Plaintiff's Opposition Memorandum (Doc. # 126). In deciding to purchase the home, plaintiff relied on Bunting's promise to make the repairs and his claim that the contract obligated her to

---

4. The real estate contract specifically states:
 In the event the inspection report(s) indicates that the aggregate total dollars for all repairs or replacement needing to be made which can be properly completed for less than one percent (1.00%) of the purchase price or $, whichever is less, Purchaser agrees to accept subject property in its "as is" condition. In the event the cost estimate of said repairs or replacements exceeds the foregoing amount, Purchaser shall have the option of either accepting

subject property in its "as is" condition or canceling this Contract; provided, however, Seller shall have the option of keeping this Contract in force by agreeing either to complete said repairs or replacements in excess of the foregoing amount, or to reimburse Purchaser in the amount that the cost of repairs or replacements exceeds the foregoing amount, on or before the date of closing.
Exhibit G in Defendants' Support Memorandum (Doc. # 114) at 2.

purchase the home. Bunting made these statements with intent to deceive and defraud her, and to induce her reliance on them.[5] Plaintiff believed that his statements were true because she did not have a copy of the real estate contract. Bunting believed that the transaction was a typical one, however, and that its terms were not unfair or discriminatory towards plaintiff.

After plaintiff purchased the home, she discovered that it had a broken water pipe, no heat or air-conditioning, a damaged garage door, and an outdated and leaky water heater. These defects made the property unfit for occupancy, but plaintiff and her daughter have resided in the home since plaintiff purchased it. Throughout the following year, plaintiff left messages for Bunting at Countrywide or on his answering machine, regarding repairs. Within a month of taking possession, plaintiff paid her first visit to Countrywide's office to request repairs. Before the transaction closed on July 2, 1998, Bunting's only contact with plaintiff had been in connection with the real estate deal. Later that month, however, he began to pursue a sexual relationship with plaintiff.[6]

In July of 1998, plaintiff visited Countrywide. At that time, Candace Thomas, who was Countrywide's office manager and Bunting's secretary, told plaintiff that "[y]ou are good in getting a man." Plaintiff's Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶ 32. On another office visit that month, Candace Thomas told plaintiff that "[y]ou are a Chinese" and "[y]ou'd better to [sic] find a Chinese man in town." Id. at ¶ 35. This exchange intimidated plaintiff.

While plaintiff does not claim that the promised repairs were never made, Bunting did not complete them by July 10, 1998.[7] In August of 1998, plaintiff again visited Countrywide to inquire about repairs.

On November 23, 1998, Bunting arrived at plaintiff's home at 9:45 a.m. and told her that he was there to repair something.

---

**5.** Plaintiff's only support plaintiff for this allegation is in her affidavit, but plaintiff had ample opportunity to observe Bunting and thereby form a lay opinion about his state of mind. See *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir.1985) (courts very liberal in admitting testimony as to another's state of mind if witness has had sufficient opportunity to draw rational conclusion about another's intent).

**6.** Plaintiff and Bunting apparently had sex for the first time on November 23, 1998. The record does not disclose the nature of the relationship in the interim.

**7.** In their reply brief, defendants submit evidence that (1) with one exception, they ultimately made all of the promised repairs, plus others; and (2) as to the one repair which they did not make, they offered to pay an outside contractor to do the work. Because this evidence was contained in their reply brief, plaintiff has not had an opportunity to respond to it. Federal Rule of Civil Procedure 56(c) requires that the nonmoving party to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials. Therefore the Court will not rely on this new information. See *Wagher v. Guy's Foods, Inc.*, 765 F.Supp. 667, 671 (D.Kan.1991) ("In pursuit of fairness and proper notice, this court's practice is to deny or exclude summarily all arguments and issues first raised in reply briefs."); see also *Doebele v. Sprint Corp.*, No. 00–2053–KHV, 2000 WL 1745262, at *2 (D.Kan. Nov. 17, 2000) (same).

To the extent that it is relevant, however, the Court will take into account *plaintiff's* evidence that defendants made more repairs than Bunting had originally promised. For example, plaintiff cites evidence that Bunting helped repair her garage door and on July 21, 1998, she sent Bunting a fax which asked him to work on her water filter, toilet seat, fosse bathroom ring, back yard gate lock, ping pong table, telephone outlet and bedroom wallpaper. See Exhibit N in Plaintiff's Opposition Memorandum (Doc. # 126).

Bunting touched plaintiff's breasts and stated that he wanted to go to bed with her. The sight of Bunting's naked back made plaintiff fearful. When he noticed plaintiff's reaction, Bunting yelled "[w]hat are your [sic] scared for?" and "[h]ave you ever seen a man's back before?" Ultimately, Bunting seduced plaintiff instead of completing the repairs. After Bunting and plaintiff finished having sex, he used plaintiff's phone without permission. Upon learning that a customer had been waiting in his office for ten minutes, Bunting yelled at plaintiff "[t]his is all your fault" and rushed out of her home. After this incident, plaintiff felt that Bunting sexually abused her with complete indifference to her emotional distress and lack of knowledge of American social norms.

Bunting started a practice of calling plaintiff at work about repairs and asking her to go home at 11:00 a.m. When she arrived, he would look at what needed to be fixed and demand sexual favors. After sex, Bunting would say that he would send someone over to complete the repairs, and then leave. Actually Bunting did not send anyone to do the repairs and according to plaintiff, he threatened to alter plaintiff's life in Topeka (and that of her daughter) if she refused his advances. On March 23, 1999, Bunting asked plaintiff to go home at 11:15 a.m. Plaintiff wrote Bunting a check for $625.00 for a garage door and then he rushed her into bed and had sex with her.

On March 31, 1999, plaintiff called Countrywide to inquire about a repair to her home. Plaintiff asked Candace Thomas whether, in not making repairs, Bunting was treating her like he treated other customers. She also told Candace Thomas that Bunting needed to return the key to her home, which he kept under pretext of working on repairs. Candace Thomas asked Bunting to give her plaintiff's key, so that she could return it to plaintiff at Countrywide's office the next day.[8] She also said that Bunting and plaintiff were not supposed to contact each other and that everything should go through her. At 12:20 p.m. on March 31, Bunting called plaintiff at work to tell her that on the advice of Candace Thomas, he was going to hand plaintiff over to his attorney and get a restraining order against her. Plaintiff did not want to see Bunting close to her home and she was concerned that he would try to drop off the key. She therefore dialed 911 to report the incident and her fear of Bunting. She asked a police officer to go to her home and protect her when Bunting dropped off the key. Later that day, Bunting confronted plaintiff on her driveway and stated that Candace Thomas had actually requested the restraining order (not him). Bunting also made plaintiff feel threatened because he said in a gruff and intimidating voice that no one was bigger in Topeka than he was.

On June 10, 1999, plaintiff found out that Bunting had blocked her calls to his home telephone number. Four days later, on June 14, 1999, Bunting called plaintiff at work during lunch and asked her to go home to show him things around the house. When plaintiff met Bunting, he said that Jeff's girlfriend, who lived with Bunting, had actually placed the block. Bunting then demanded and received sexual favors.

Plaintiff became fearful about Bunting coming into her home. In June of 1999, plaintiff spoke with her daughter every day on the phone about her fear of Bunting. Plaintiff's daughter told her that she

---

8. Plaintiff asserts that Bunting told Candace Thomas that he kept the key to plaintiff's home at his own house and that he would deliver the key to plaintiff's home. Although plaintiff includes this information in her affidavit, it is not clear that she has personal knowledge of such facts and the Court will disregard them.

had the right to refuse Bunting's requests for sex.

On June 30, 1999, Bunting entered plaintiff's house at 6:45 a.m. under the guise of repairing something. Bunting pushed plaintiff into her bedroom and touched her breasts and genitalia while taking off her clothes. Plaintiff told Bunting "No, no, stop!" and tried to push him away, but he did not listen and eventually raped her.

On July 1, 1999, plaintiff called Countrywide and requested its fax number so that she could fax over a summary of her complaint that Bunting had not completed repairs. Candace Thomas believed that plaintiff would tie up the telephone line with faxes that were unrelated to business, see Exhibit F in Plaintiff's Opposition Memorandum (Doc. # 126) at 39:9–13, and she refused to give plaintiff the fax number. Plaintiff thought that defendants had had a reasonable time to complete the repairs, so she visited the Countrywide office the same day and got permission from Robert Thomas, a real estate agent who worked for Countrywide, to write the company's president a letter which complained about the defects in her home. While plaintiff was submitting her complaint, Robert Thomas approached her in a physically threatening manner and yelled at her to get out of the office immediately.

He also threatened to sue her, have the police arrest her and get her employer to fire her.[9] Plaintiff had no contact with Robert Thomas or Candace Thomas, except when she visited Countrywide to speak with Bunting.

On July 2, 1999, two days after Bunting raped her, plaintiff discussed the rape with an attorney in her employee assistance program at work. The rape had so traumatized plaintiff that she had been previously unable to speak of it. Following the attorney's suggestion, plaintiff went to the police and reported the rape.

On April 28, 2000, plaintiff filed a complaint with the Department of Housing and Urban Development, alleging that Countrywide, Bunting, Robert Thomas and Candace Thomas had engaged in discriminatory housing practices in violation of the Fair Housing Act Amendments of 1988, 42 U.S.C. § 3601 et seq.[10]

At some point during their relationship, Bunting began to feel that plaintiff was harassing him. Bunting retained an attorney, Thomas G. Lemon, with Fisher, Cavanaugh, Smith & Lemon, P.A., to assist him in ending plaintiff's harassment. On May 12, 2000, defense counsel sent plaintiff a letter which accused her of stalking Bunting and warned that if such behavior continued, legal action would be taken. More

---

**9.** Plaintiff claims that Robert Thomas took this action at Bunting's direction, but aside from her conclusory allegation to this effect, she provides no support for this statement. Defendants do not deny that Robert Thomas asked plaintiff to leave Countrywide, but state that he did so because of plaintiff's irrational behavior, which was unsuitable for a business environment, and not due to any racial or sexual animus. Plaintiff provides no evidence that race or gender animus motivated his actions.

**10.** Plaintiff's HUD complaint originally alleged that (1) Bunting and Countrywide discriminated against plaintiff by failing to correct defects in her home; (2) Bunting and Countrywide engaged in intimidation, threats or coercion when Bunting visited plaintiff at work and threatened her with legal action if she did not purchase the home; (3) Robert Thomas discriminated against her by making threatening statements and actions; (4) Candace Thomas interfered with plaintiff's ability to file a complaint; (5) Bunting discriminated against her by making her exchange repairs for sex; and (6) Bunting discriminated against her by subjecting her to sexual assault and rape. Plaintiff later added allegations that Bunting and Countrywide had attempted to intimidate, threaten or coerce her by a letter from defense counsel on May 12, 2000 and an action for a permanent restraining order filed May 18, 2000.

specifically, defense counsel sent plaintiff the following letter:

Be advised that our firm represents Marc Bunting, Bunting Appraisal Services and Bunting Real Estate Services. All further contact with Mr. Bunting or his businesses should be directed to our attention.

Mr. Bunting informs me that you have engaged in a two year practice of stalking, criminal trespass and telephone harassment against he [sic] and his businesses. Any additional furtherance of this behavior will result in a request that criminal charges be filed against you. Be advised that we are very serious about this and will take all legal measures necessary to ensure that your behavior is stopped.

If you contact either Mr. Bunting or his family by phone, it will be considered telephone harassment. The police will be contacted and it will be requested that prosecution be commenced. If you enter onto or into any property owned, leased or otherwise legally occupied by Mr. Bunting or his family, the police will be called and it will be requested that you be prosecuted for criminal trespass.

Mr. Bunting only wishes for you to leave he [sic] and his family alone. If you will simply cease your harassment, all involved will be free to go about their lives. If not, Mr. Bunting does not intend to allow you the pleasure of continuing with this conduct. Legal action will be taken and taken swiftly. I trust that the above will result in you ceasing your unlawful behavior.

Exhibit P in Plaintiff's Opposition Memorandum (Doc. # 126) filed May 4, 2001. Plaintiff claims that the actions of defense counsel impaired her housing complaint with HUD.

One week later, on May 19, 2000, defense counsel filed a petition for a permanent restraining order. On November 1, 2000, Bunting's petition for a restraining order went to trial in the District Court of Shawnee County, Kansas. Plaintiff had filed her own petition for a permanent restraining order, and Judge Franklin R. Theis consolidated the hearing of both petitions. At the conclusion of a one-day trial, Judge Theis found that plaintiff's continued calls and attempts to resolve matters were inappropriate because Bunting had told plaintiff not to contact him. He therefore granted Bunting's request for a permanent restraining order. He denied plaintiff's petition for a restraining order because a restraining order is prospective in nature and any harm to her (such as the rape) was not continuing in nature. The trial made plaintiff feel tortured and humiliated, and defending against the petition subjected her to psychological pressure.

Plaintiff incurred expenses of $1,415.28 in completing her home repairs. She has pending repair expenses in excess of $2,714.32, and has suffered damage to her personal property and other incidental and consequential damages. Plaintiff claims that defendants caused her to feel "severe and grievous mental and emotional suffering, fright, anguish, shock, nervousness, anxiety" and that she continues to be fearful, anxious and nervous. See Plaintiff's Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶ 29. Plaintiff has submitted a letter from Dr. Jonathan M. Farrell–Higgins, who treated plaintiff for post-traumatic stress disorder following the sexual assault. Plaintiff expects that such counseling will continue indefinitely into the future. Plaintiff further states that due to Bunting, she has suffered tangible economic and emotional losses such as harm to her professional reputation, legal costs and mental anguish. Plaintiff believes that defendants will continue to harm her unless they are prevented by appropriate injunctive measures.

Plaintiff alleges that defendants violated Section 818 of the Fair Housing Act Amendments of 1988 and 42 U.S.C. § 1982 (Count I); committed fraudulent and negligent misrepresentation during negotiation of a real estate contract, violated Kansas consumer protection statutes, breached real estate brokers' duties, negligently performed voluntary undertakings, maliciously prosecuted her, intentionally inflicted emotional distress and committed civil conspiracy (Count II); and violated 42 U.S.C. §§ 1962(c) (Count III) and 1962(d) (Count IV). Plaintiff does not specify which defendant she is suing under each theory. The Court must therefore assume that plaintiff is suing all defendants on all counts.

Defendants now seek summary judgment on plaintiff's claims.[11] As to plaintiff's Fair Housing Act claim (Count I), defendants claim that they are entitled to summary judgment because (1) plaintiff cannot show that the underlying real estate transaction was discriminatory; (2) plaintiff's complaints deal with incidents which occurred after she purchased the home and are therefore outside the scope of the Fair Housing Act; (3) aside from Bunting and Countrywide, plaintiff has not alleged a link between any mistreatment and her membership in a protected class;

and (4) plaintiff harassed Bunting and not the other way around. Defendants also argue that plaintiff has not demonstrated genuine issues of material fact on her claims for fraud and negligent misrepresentation (Count II(A)), negligence (Count II(D)) and intentional infliction of emotional distress (Count II(F)). They further contend that as a matter of law, since they prevailed in their lawsuit against plaintiff, they cannot be liable for malicious prosecution (Count II(E)).

## Analysis

### I. Order To Show Cause

On May 30, 2001, the Court denied plaintiff permission to amend her complaint to allege that Thomas G. Lemon and Fisher, Cavanaugh, Smith & Lemon P.A. had violated the Fair Housing Act and 42 U.S.C. § 1982. While the Court granted plaintiff leave to otherwise amend her complaint, it ordered plaintiff to show cause why the Court's order of dismissal in *Zhu v. Fisher Cavanaugh*, 151 F.Supp.2d 1254, should not bar all proposed claims against Lemon and his law firm.[12]

■ In response to the Court's show cause order, plaintiff does not raise any meritorious argument which justifies her failure to raise all claims against Lemon

---

**11.** After defendants filed their motion for summary judgment, the Court granted plaintiff leave to file a second amended complaint. To the extent that defendants' motion addresses claims which are not advanced in plaintiff's second amended complaint, the motion is overruled as moot.

**12.** In *Zhu v. Fisher Cavanaugh*, 151 F.Supp.2d 1254, plaintiff alleged that defense counsel had violated her rights under 42 U.S.C. §§ 1982 and 1983 by discriminating against her on the basis of race, sex, national origin and familial status and engaged in threatening conduct, coercion, interference, intimidation, harassment and conspiracy in violation of the Fair Housing Act. The Court dismissed that complaint for failure to state a

claim. See Order (Doc. # 5) filed September 26, 2000. When plaintiff attempted to reassert those claims and some additional ones in Case No. 00–2290–KHV, the Court found that plaintiff's proposed amendment did not rely on new factual allegations or transactions between the parties; she merely sought to advance new legal theories by way of a second lawsuit. The Court therefore denied plaintiff leave to amend to assert any claims based on 42 U.S.C. §§ 1982 and 1983 and the Fair Housing Act and ordered plaintiff to show cause why its dismissal of *Zhu v. Fisher Cavanaugh*, 151 F.Supp.2d 1254, should not bar her from maintaining suit on any claims against defense counsel, based on the same facts and occurrences as the previous suit. See Order (Doc. # 148) filed May 30, 2001.

and Fisher Cavanaugh in the first lawsuit. Plaintiff argues that she did not have an opportunity to raise all of her arguments because the Court dismissed her suit. Before the Court dismissed her suit, however, she had ample opportunity to plead all purported causes of action.

■ Res judicata operates to bar all claims arising out of the same transaction which could and should have been raised in that action. See *Schwartz v. Coastal Physician Group, Inc.*, 172 F.3d 63, 1999 WL 89037, at \*3 (10th Cir. Feb. 23, 1999) (res judicata barred second action when claims arose from same transaction and sought same redress for injury). Plaintiff cannot split her claim into multiple lawsuits; she must present all claims which arise from the same transaction in one suit. See *Myers v. Colgate–Palmolive Co.*, 102 F.Supp.2d 1208, 1224 (D.Kan.2000) (ERISA suit dismissed when plaintiff had already filed ADEA/Title VII suit against employer). Because plaintiff has not shown why res judicata should not bar her second attempt to sue Lemon and Fisher Cavanaugh, the Court dismisses with prejudice all claims against them.

## II. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## A. Motion To Strike Deposition Transcript

As an initial matter, plaintiff asks the Court to strike the transcript of her deposition which is attached to defendants' motion for summary judgment. Plaintiff claims that the court reporter did not accurately transcribe her deposition and that defendants have not followed the Federal Rules of Civil Procedure in using her transcript. Specifically, plaintiff asserts the following irregularities: (1) defendants violated Rule 30(e) by using an unsigned deposition that was not accurately transcribed; (2) the court reporter did not attach to the deposition transcript the documents produced during the deposition, in violation of Rule 30(f)(1); (3) the court reporter did not certify that the deposition was complete or set forth any stipulations regarding custody of the transcript or exhibits, in violation of Rule 30(b)(4); and (4) the court reporter did not certify that plaintiff was sworn and that the deposition was a true copy of her testimony, in violation of Rule 30(f)(1).

Plaintiff first argues that her transcript should be stricken because she did not have the opportunity to read, correct and sign the deposition transcript-even though the deposition indicates that she reserved her right to do so. See Exhibit F in Defendants' Support Memorandum (Doc. # 114) at 10:1–3, 136:13–16 and 138:10–16. Plaintiff asserts that the court reporter never advised her that the transcript was available for review, and that she never had a chance to review and correct it. Plaintiff claims that defendants therefore violated Rule 30(e) by using her unsigned deposition in support of their motion for summary judgment. Rule 30(e) provides as follows:

(e) REVIEW BY WITNESS; CHANGES; SIGNING. If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

Even if plaintiff did not have a chance to review and correct her deposition in a timely manner, she has done so now. With her motion to strike, plaintiff has submitted an affidavit which sets forth corrections to her deposition. To this extent, plaintiff has adopted the deposition transcript, as corrected, for purposes of the summary judgment proceedings. Defendants do not object to using plaintiff's deposition along with her corrections. This concession appears to sufficiently address plaintiff's concerns about the accuracy of her deposition transcript.

■ Plaintiff also complains that defendants did not attach to the deposition transcript the documents which were produced during the deposition, in violation of Rule 30(f)(1). Rule 30(f)(1) provides as follows:

(1) ... Unless otherwise ordered by the court, the officer must securely seal the deposition ... and must promptly send it to the attorney who arranged for the transcript or recording, who must store it under conditions that will protect it against loss, destruction, tampering, or deterioration. Documents and things produced for inspection during the examination of the witness, must, upon the request of a party, be marked for identification and annexed to the deposition and may be inspected and copied by any party, except that if the person produc-

ing the materials desires to retain them the person may (A) offer copies to be marked for identification and annexed to the deposition and to serve thereafter as originals if the person affords to all parties fair opportunity to verify the copies by comparison with the originals, or (B) offer the originals to be marked for identification, after giving to each party an opportunity to inspect and copy them, in which event the materials may then be used in the same manner as if annexed to the deposition.

Defendants concede that because they wanted to make the summary judgment record less voluminous, they did not attach all deposition exhibits to the deposition transcript which they submitted in support of their motion. Local court rules encourage this practice; D. Kan. 56.1 expressly states that "[w]here facts referred to in an affidavit or declaration are contained in another document, such as a deposition, ... a copy of the *relevant excerpt* from the document shall be attached [emphasis added]." Rule 30(f)(1) merely requires that upon the request of a party, documents be annexed to the official deposition transcript; it does not speak to how portions of the deposition transcript may be later used as evidence or incorporated in the summary judgment record. Therefore the Court will not strike plaintiff's deposition transcript for non-compliance with Rule 30(f)(1).

■ Plaintiff next argues that the Court should strike her deposition transcript because the court reporter did not state that her testimony was complete or set forth any stipulations about custody of the transcript or exhibits, in violation of Rule 30(b)(4). Rule 30(b)(4) provides that "[a]t the end of the deposition, the officer [appointed or designated to take the deposition under Rule 28] shall state on the record that the deposition is complete and shall set forth any stipulations made by counsel concerning the custody of the tran-

script or recording and the exhibits, or concerning other pertinent matters." Plaintiff has not shown that the parties entered into any stipulations that the reporter failed to note on the record. Defendants claim that the court reporter certified that the testimony was complete and that this certification is on page 140 of the deposition transcript. This page is not present, however, in the Court file. Plaintiff claims that the certification is not present in pages one through 139, but she does not mention page 140. The Court therefore assumes that page 140 does include the required certification. In any case, plaintiff's submission of corrections along with the deposition addresses any concerns about the completeness of the transcript. Plaintiff does not identify any stipulations which were omitted from the transcript in violation of Rule 30(b)(4), and the transcript will not be stricken for non-compliance with that rule.

Plaintiff also asks the Court to strike the deposition transcript because the court reporter did not certify that plaintiff was sworn and that the deposition was a true copy of her testimony, in violation of Rule 30(f)(1). That rule provides as follows:

> The officer must certify that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. This certificate must be in writing and accompany the record of the deposition.

Defendants claim that the court reporter made the required certification, but they do not include it in the copy of the deposition that they have provided to the Court. Under Rule 30(f), "[e]xcerpts from depositions are not competent summary judgment evidence unless the party offering them attaches a copy of the court reporter's certificate certifying that the copy is true and correct." See *Refrigeracion Y Restaurante S.A. De C.V. v. Wal–Mart*

*Stores, Inc.*, No. SA97CA354EP, 1998 WL 1782541, at *1 (W.D.Tex.1998). The typical remedy for non-compliance with this rule is to allow the party to supplement its brief to attach a copy of the court reporter's certification. *Id.* at *2. In this case, however, plaintiff has received a copy of the deposition and has had the opportunity to ensure that it is true and correct. Therefore the Court will not strike the deposition transcript for non-compliance with Rule 30(f)(1). See *McVay v. Cincinnati Union Terminal Co.*, 416 F.2d 853, 856 (6th Cir.1969) (failure to certify deposition not harmful when adverse party saw document prior to trial).

In summary, plaintiff has submitted a 13 page document which outlines 40 corrections to her deposition transcript. Accordingly, the Court denies her motion to strike. In considering defendants' summary judgment motion the Court will utilize the deposition transcript, but only as corrected.[13]

## B. Violations Of Fair Housing Laws (Count I)

Count I of plaintiff's second amended complaint alleges that defendants acted in a willful and wanton manner in violation of 42 U.S.C. § 3617 and 42 U.S.C. § 1982 in denying her rights as a customer, home buyer and homeowner because of her sex, race and national origin.[14] The three-part burden of proof analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), has been widely applied to FHA and Section 1982 claims. See *Marthon v. Maple Grove Condo. Ass'n*, 101 F.Supp.2d 1041, 1050 (N.D.Ill.2000) ("under the Housing Act a plaintiff 'may establish that a defendant had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the

---

**13.** Ordinarily, the original answers to the deposition questions would remain part of the record. See *Lugtig v. Thomas*, 89 F.R.D. 639 (N.D.Ill.1981) (nothing in Rule 30(e) mandates striking original answers) (citing *Usiak v. N.Y. Tank Barge Co.*, 299 F.2d 808 (2d Cir.1962); *Allen & Co. v. Occidental Petrol. Corp.*, 49 F.R.D. 337 (S.D.N.Y.1970)). In this case, however, the record does not contain a court reporter's certification that the original transcript is an accurate record of plaintiff's testimony. Therefore the Court will merely review the original answers to ensure that plaintiff is not changing her deposition to give more artful answers, see *Rios v. Welch*, 856 F.Supp. 1499, 1502 (D.Kan.1994) (citations omitted) (deposition is not a "take home examination"), because plaintiff is only allowed to correct transcription errors. See *Innovative Mktg. & Tech., L.L.C. v. Norm Thompson Outfitters, Inc.*, 171 F.R.D. 203, 204 (W.D.Tex. 1997).

**14.** Count I alleges violations of 42 U.S.C. §§ 1982 and 3617 and Section 818 of the Fair Housing Act Amendments of 1988. When Congress amended the Fair Housing Act in 1988, it redesignated Section 818 of the Fair Housing Act as 42 U.S.C. § 3617. See Fair Housing Act Amendments of 1988, Pub.L. No. 100–430, 102 Stat. 1619 (1988). Therefore the Court analyzes her claim under 42 U.S.C. § 3617. Also, Count I mentions national origin and sex, but omits a direct reference to race. In light of plaintiff's allegation that Section 1982 provides rights equal to those of white citizens, and the introduction of plaintiff's second amended complaint, which states that this action is brought to redress race and sex discrimination, it appears that plaintiff has not abandoned this claim. The line between race and national origin discrimination claims is often not a bright one, particularly in a case such as this when the protected racial class is Asian and the protected national origin is Chinese. Cf. *Shinwari v. Raytheon Aircraft Co.*, 25 F.Supp.2d 1206, 1210 (D.Kan. 1998) (race claim abandoned when plaintiff mentioned only national origin and age in pretrial order). Plaintiff does not distinguish between Section 1982 and Section 3617 when alleging discrimination on the basis of national origin, race and sex. Since Section 1982 only addresses racial discrimination, the Court presumes that plaintiff means to allege racial discrimination under Section 1982 and national origin, race and sex discrimination under Section 3617.

inferential burden shifting method known as the *McDonnell Douglas* test' ") (quoting *Kormoczy v. Sec'y, United States Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir.1995)); see also *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir.1989) (citing *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 822–23 (10th Cir.1981); *Phiffer v. Proud Parrot Motor Hotel*, 648 F.2d 548, 551 (9th Cir.1980); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979)). Plaintiff does not provide direct evidence of discrimination. Therefore, under the *McDonnell Douglas* analysis, plaintiff first must come forward with proof of a prima facie case of discrimination. If plaintiff proves a prima facie case, the burden shifts to defendants to produce evidence that their actions were motivated by legitimate, non-racial considerations. *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Once defendants by evidence articulate non-discriminatory reasons, the burden shifts back to plaintiff to show that the proffered reasons were pretextual. *Id.*

### 1. 42 U.S.C. § 3617

Plaintiff asserts that defendants violated 42 U.S.C. § 3617 of the Fair Housing Act because they "acted in a willful and wanton manner in denying the [p]laintiff her right[s] and privilege[s] as a customer, homebuyer and homeowner." Amended Complaint (Doc. # 166) filed June 12, 2001 at 28. Under Section 3617, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted of protected by section 3603, 3604, 3605, 3606 of this title."

▮ In order to make out a prima facie case under Section 3617, plaintiff must demonstrate that (1) she is a member of a protected class under the Fair Housing Act; (2) she exercised or enjoyed a right protected by Sections 3603 through 3606, or aided or encouraged others in exercising or enjoying such rights; (3) intentional discrimination motivated defendants' conduct, at least in part; and (4) defendants' conduct constituted coercion, intimidation, a threat, or interference on account of plaintiff having exercised, or aided or encouraged others in exercising, a right protected under Sections 3603 through 3606. See *United States v. Sea Winds of Marco, Inc.*, 893 F.Supp. 1051, 1055 (M.D.Fla.1995) (citing *People Helpers Found. v. City of Richmond*, 781 F.Supp. 1132 (E.D.Va.1992); *Cass v. Am. Props., Inc.*, No. 94–2977, 1995 WL 132166 (N.D.Ill. Feb. 27, 1995)). A violation of Section 3617 may be shown even absent other violations of the Fair Housing Act. See *Stackhouse v. DeSitter*, 620 F.Supp. 208, 210 (N.D.Ill.1985) (requiring violation of other sections of FHA to state claim under Section 3617 would render Section 3617 superfluous).

▮ Defendants do not deny that due to her national origin, race and sex, plaintiff is a member of a protected class under the FHA. Defendants contend, however, that plaintiff has not demonstrated a genuine issue of material fact on the last two factors of her prima facie case: (1) that intentional discrimination motivated their conduct; and (2) that defendants' conduct constituted coercion, intimidation, a threat, or interference on account of plaintiff having exercised, or aided or encouraged others in exercising, a right protected under Sections 3603 through 3606. Plaintiff does not specifically allege how she attempted to exercise rights protected by Sections 3603 through 3606, or what defendants did to "retaliate" against her. The body of her amended complaint, however, contains

the following allegations: (1) on July 1, 1999, Bunting told Robert Thomas to intimidate, coerce and threaten her; (2) on July 1, 1999, when plaintiff filed a complaint at Countrywide's office, Robert Thomas approached plaintiff in a physically threatening manner, yelled at her to get out of the door immediately, told her to never come to the Countrywide office again, and stated that he would sue her, have the police arrest her and have her employer fire her; (3) defense counsel sent plaintiff a threatening letter dated May 12, 2000 after she filed a complaint with the Department of Housing and Urban Development ("HUD"); (4) defendants responded to the HUD investigation with fraud and deception on May 18, 2000; (5) defendants defamed plaintiff during legal proceedings; and (6) on May 19, 2000, defendants committed malicious prosecution by seeking a permanent restraining order against plaintiff in Shawnee County, Kansas.

Liberally construing plaintiff's complaint, the Court understands her retaliation claim to be two-fold: First, on July 1, 1999, after plaintiff complained to Countrywide that Bunting had not timely completed the repairs to her home, Robert Thomas (under Bunting's direction) approached plaintiff in a physically threatening manner, yelled at her to get out of the door immediately, told her to never come to Countrywide's offices again, and stated that he would sue her, have the police arrest her and have her employer fire her. Second, after plaintiff filed a HUD complaint against Countrywide, Bunting, Robert Thomas and Candace Thomas on April 28, 2000, defendants retaliated against her by (1) having defense counsel send plaintiff a threatening letter on May 12, 2000; (2) seeking a permanent restraining order on May 19, 2000; and (3) defaming plaintiff during legal proceedings and responding to the HUD investigation with fraud and deception.

As an initial matter, in analyzing the claims against the separate defendants, it is clear that both Bunting Appraisal Services and Wittmer are entitled to summary judgment. Plaintiff makes no allegations which implicate Bunting Appraisal Services in these events. And while plaintiff includes Wittmer in several factual statements, she cites no record support for her claim that it was involved in any allegedly retaliatory act. Summary judgment is therefore appropriate as to these defendants.

Summary judgment is also appropriate as to plaintiff's claim that defendants retaliated against her by defaming her with perjury and sending a "fraud[ulent], false and defaming [a]nswer to HUD." Amended Complaint (Doc. # 166) at 22. Defendants have submitted affidavits that they did not retaliate against plaintiff for filing a HUD complaint. Plaintiff's response does not explain which statements she considers to be perjurious, or how defendants' answer to the HUD complaint was fraudulent, false or defamatory. For that matter, plaintiff does not explain what defendants' answer was. In response to a motion for summary judgment, plaintiff has the burden to provide some sort of factual support for her case. In other words, conclusory and self-serving affidavits are not sufficient. See *Hall*, 935 F.2d at 1111 (citing Fed.R.Civ.P. 56(e); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989)). Summary judgment is therefore appropriate on these claims.

The Court addresses the remaining allegations in turn. In doing so, the Court assumes without deciding that when plaintiff complained to Countrywide on July 1, 1999 and filed a HUD complaint on April 28, 2000, she was exercising rights protected by Sections 3603 through 3606.

Plaintiff's first contention is that under Bunting's direction, Robert Thomas ap-

proached her in a physically threatening manner and verbally threatened her when she attempted to file a complaint at the Countrywide office. Preliminarily, the Court notes that plaintiff has submitted no competent evidence that Bunting told Robert Thomas to intimidate her. Bunting is therefore entitled to summary judgment on this claim. As to Robert Thomas, plaintiff must demonstrate that intentional discrimination motivated his conduct, at least in part. See *People Helpers*, 781 F.Supp. at 1134 (intent found when neighbors made derogatory comments about minorities). Plaintiff has not cited any direct evidence at all that Robert Thomas was motivated, even in part, by plaintiff's race, sex or national origin. Plaintiff may establish her prima facie case through indirect evidence or proof of disparate impact. See *id.* (citing *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1343 (D.N.J.1991)). Plaintiff has provided no such evidence in support of her claims. Without a demonstrated connection between the actions of Robert Thomas and plaintiff's protected class, plaintiff cannot survive summary judgment on her claim against him. Thomas is therefore entitled to summary judgment on plaintiff's claim of retaliation.

To the extent that Countrywide might be liable because Robert Thomas threatened her and Candace Thomas mentioned that plaintiff should date a Chinese man, the two incidents have no demonstrated relationship with each other. The stray remark by Candace Thomas does not have any proven relationship to plaintiff's rights under the Fair Housing Act. Furthermore, plaintiff does not allege that Robert Thomas was aware of the comment by Candace Thomas.

Plaintiff next alleges that all defendants retaliated against her for filing a HUD complaint. The record shows, however, that Bunting committed each alleged act of retaliation: Bunting "hand[ed] plaintiff over to his attorney," and employed counsel to write a letter and seek a permanent restraining order in Shawnee County. All of plaintiff's remaining allegations therefore center on Bunting individually and, perhaps through principles of vicarious liability, Countrywide.

As noted above, in order to make out a prima facie case under Section 3617, plaintiff must demonstrate that intentional discrimination motivated defendants' conduct, at least in part. Nothing in the letter from defense counsel dated May 12, 2000, overtly suggests unlawful intent, either on Bunting's part or that of his lawyers. See, e.g., *People Helpers*, 781 F.Supp. at 1135–36 (making derogatory remarks to minority residents, picketing, taking photographs of residents in a threatening manner and communicating indirect threats through police department illegal activities under FHA); *Johnson v. Smith*, 810 F.Supp. 235 (N.D.Ill.1992) (cross-burning on minority homeowner's lawn constituted threat); *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir.1991) (retaliation claim stated when defendants sent minority plaintiff letter stating that they would "break [him] in half" if he did not move out of neighborhood). Counsel sent the letter just two weeks after plaintiff filed the HUD complaint, however, and it threatened criminal proceedings—arguably unjustified—if plaintiff did not leave Bunting alone. The threat of legal action can be a "powerful instrument of coercion," *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 740–41, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (holding that employer suit against employee may be coercive because "[r]egardless of how unmeritorious the employer's suit is, the employee will most likely have to retain counsel and incur substantial legal expenses to defend against it"), and the timing of this letter supports an inference of causation. Summary judgment is inappropriate as to this claim.

Similarly, the fact Bunting filed his petition for a restraining order roughly three weeks after plaintiff filed her HUD complaint raises an inference of causation. See *Ward v. Wal–Mart Stores, Inc.*, 140 F.Supp.2d 1220, 1230–31 (D.N.M.2001) (temporal proximity between date employee filed EEOC claim and employer's appeal of unemployment compensation award raised inference of retaliatory motive). Plaintiff has therefore established a prima facie case of retaliation: (1) she has shown that she is a member of a protected class; (2) for the purposes of summary judgment, defendants do not contest that she engaged in protected activity under the Fair Housing Act by filing her HUD claim; (3) the timing of the letter and the lawsuit raises an inference of retaliation; and (4) Bunting's letter and suit constitute adverse actions that could deter plaintiff from exercising her rights under the Fair Housing Act.

In their summary judgment motion, defendants have not applied the McDonnell Douglas burden-shifting test. Because defendants do not meet their burden of production under McDonnell Douglas, plaintiff's prima facie case stands uncontested. Therefore Bunting and Countrywide are not entitled to summary judgment.

### 2. 42 U.S.C. § 1982

In Count I of her petition for relief, plaintiff cites 42 U.S.C. § 1982. Under 42 U.S.C. § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Congress enacted Section 1982 to enforce the Thirteenth Amendment and to prohibit all racial discrimination, private and public, in the sale and rental of property. See *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)).

■ To state a prima facie case plaintiff must allege that (1) she is a member of a racial minority; (2) defendants denied her rights or benefits connected with the ownership of property; and (3) defendants would not have denied these rights and benefits in the absence of racial discrimination. See *Reeves v. Carrollsburg Condominium Unit Owners Ass'n*, No. 96–2495RMU, 1997 WL 1877201, at *8 (D.D.C. Dec. 18, 1997) (defendants violated Section 1982 by not enforcing rules violations regarding racial harassment in way other rules were enforced).

■ As with plaintiff's Fair Housing Act claim, it is uncontroverted that plaintiff is a member of a racial minority. Defendants argue, however, that they did not deny plaintiff any rights or benefits connected with property ownership and that racial discrimination is not at issue here. Under Count I of plaintiff's complaint, which contains her Section 1982 claim, plaintiff does not state which rights and benefits of ownership were allegedly denied her. Plaintiff's complaint makes only one specific reference to racial animus, and it involves the conversation between plaintiff and Candace Thomas.[15] Plaintiff spe-

---

**15.** Plaintiff's amended complaint scarcely mentions race at all. Aside from the comment discussed above, her complaint states that (1) "laws were enacted to guarantee a right to a housing market free from discrimination based on race, color ..."; (2) discrimination based on race, sex and violations of her rights caused her damages such as financial losses, humiliation, embarrassment, and emotional distress; (3) defendants attempted to not admit that racial and gender discrimination were hazardous; and (4) defendants "acted in a willful and wanton manner in denying the [p]laintiff her right[s] and privilege[s] as a customer, homebuyer and homeowner because of the [p]laintiff's sex and national origin." Amended Complaint (Doc.

cifically cites evidence that during a visit to the Countrywide office in July of 1998, Candace Thomas told plaintiff that "[y]ou are a Chinese" and "[y]ou'd better to [sic] find a Chinese man in town." Plaintiff's Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶ 35. This conversation occurred after plaintiff purchased her home and she does not state how Candace Thomas (or any other defendants) denied her rights and benefits associated with home ownership. Therefore, even if these comments suggest racial animus, they are not actionable under 42 U.S.C. § 1982. Defendants are entitled to summary judgment on this claim.

### C. Defendants' Liability For Fraud (Count II(A))

Plaintiff alleges that defendants made fraudulent representations, in that they (1) fraudulently misled plaintiff, her child, governmental authorities and other members of the public; (2) made false and misleading statements to sell the subject property; (3) made false promises to repair; (4) fraudulently concealed information relating to the issue of the real estate contract and the character of the property; and (5) falsely denied equal housing opportunities to plaintiff and her child.[16]

■ As an initial matter, plaintiff's fraud claims implicate only Bunting and, perhaps on a theory of vicarious liability, Countrywide. Her purported fraud claims against Wittmer, Bunting Appraisal Services, Robert Thomas and Candace Thomas are without merit. Rule 9(b) of the Federal Rules of Civil Procedure requires

that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, to plead a fraud claim, plaintiff must describe the circumstances of the fraud, i.e., the time, place, and content of the false representation; the identity of the person making the representation; and the harm caused by the complainant's reliance on the false representation. See *Smith v. MCI Telecomms. Corp.*, 678 F.Supp. 823, 825 (D.Kan.1987). Plaintiff does not allege with particularity any fraudulent act, omission or statement by Wittmer, Bunting Appraisal Services, Robert Thomas or Candace Thomas. Because plaintiff's claims do not comply with Rule 9(b), summary judgment is appropriate as to those four defendants. In addition, summary judgment is appropriate on plaintiff's claims that defendants fraudulently misled her, her child, governmental authorities and other members of the public and falsely denied equal housing opportunities to her and her child. Aside from these broad statements, plaintiff does not specifically aver how defendants misled her or anyone else. Plaintiff also does not state how defendants used fraud to falsely deny equal housing opportunities to her and her child. Summary judgment is therefore appropriate as to the claims.

### 1. False and misleading statements made in order to sell the home.

■ Plaintiff alleges that Bunting "made false and misleading statements to sell the subject property." Amended Complaint (Doc. # 166) at 29. Specifically, plaintiff asserts that Bunting affirmatively

---

# 166) at 6, 8 and 28. Plaintiff's amended complaint mentions "discrimination" numerous times, but these references do not hint at racial animus by defendants.

**16.** Plaintiff also alleges that defendants made "affirmative material misrepresentations,"

which are otherwise unidentified, and "omitted material defects" which are also unidentified. See Amended Complaint (Doc. # 166) at 29. These claims are either redundant because they replicate fraud claims which are alleged with the requisite particularity, or they are legally deficient under Rule 9(b).

misrepresented that plaintiff was obligated to buy the home, and fraudulently failed to disclose the fact that she was not required to do so.[17] See id. at 10–11. Defendants argue that they are entitled to summary judgment because (1) plaintiff has failed to state more than conclusory allegations in support of her fraud claim; (2) Bunting did not coerce plaintiff into purchasing the property or make any misrepresentations about the property; (3) the terms of the transaction were fair and not different from any other real estate transaction; (4) any reliance on Bunting's statement was unjustified because the real estate contract specified that plaintiff was buying the home "as is" and no other warranties or representations are relevant; (5) plaintiff had a real estate agent representing her in the transaction; and (6) plaintiff should have known that she did not have to buy the house.

■■■ Under Kansas law, a plaintiff in a fraud case must prove five elements by clear and convincing evidence: (1) an untrue statement of fact, (2) known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, (3) justifiable reliance on the statement to plaintiff's detriment, (4) acts to plaintiff's injury, and (5) damage. See *Hall v. Doering*, 997 F.Supp. 1464, 1473 (D.Kan.1998) (citing *Albers v. Nelson*, 248 Kan. 575, 579, 809 P.2d 1194, 1198 (1991); *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 465–67, 738 P.2d 1210, 1228–30 (1987); *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205, 1211 (1986); *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 551–52 (1980)). Stated otherwise, to make an actionable case for fraud, plaintiff must plead and prove misrepresentations of fact known by defendant to be untrue or made with reck-

less disregard for the truth, and plaintiff must have reasonably relied upon the misrepresentations to her detriment. *Id.* (citing *Tetuan*, 738 P.2d at 1230).

The elements of fraud by silence or omission are that (1) defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) defendant was under an obligation to communicate the material facts to plaintiff; (3) defendant intentionally failed to communicate to plaintiff the material facts; (4) plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) plaintiff sustained damages as a result of defendant's failure to communicate the material facts to plaintiff. See *Sithon Maritime Co. v. Holiday Mansion*, 983 F.Supp. 977, 989 (D.Kan. 1997) (citing *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 344–45, 918 P.2d 1274, 1299 (1996)) (quoting *Lesser v. Neosho County Cmty. Coll.*, 741 F.Supp. 854, 863 (D.Kan.1990)).

As to the first element of plaintiff's fraudulent misrepresentation claim, the contract did not require plaintiff to purchase the house if (1) repair costs were more than one per cent of the purchase price, and (2) the sellers did not agree to pay for all repairs over the one per cent cap or complete the repairs in excess of one per cent, on or before the date of closing. Plaintiff asserts that the needed repairs did exceed the one per cent cap, but that single fact does not establish that Bunting lied when he told plaintiff that she was contractually obligated to buy the house: the sellers were entitled to keep the contract in force by agreeing either to (1) reimburse plaintiff for the additional repairs or (2) complete the additional re-

---

**17.** Plaintiff also asserts that Bunting promised that he would take care of her home for her. This claim is subsumed in plaintiff's claim that Bunting promised to complete repairs on the home.

pairs, on or before the date of closing. Therefore, whether Bunting's statement was false depends on whether the sellers agreed to reimburse plaintiff for the excess repairs or complete them on or before the date of closing. While defendants claim that they made no misrepresentations, they have not established that either condition was satisfied. This record contains no evidence that the sellers agreed to pay for the excess repairs or that they completed them on or before July 2, 1998. As a result, plaintiff has demonstrated a genuine issue of material fact whether Bunting made a false statement when he told plaintiff that she was required to buy the house.

 For similar reasons, Bunting's failure to tell plaintiff that she had no contractual duty to purchase the property could constitute a knowing concealment of a material fact. Plaintiff argues that Bunting knew that the contract did not obligate her to buy the home and that he intentionally failed to communicate this information to her. She also argues that as a professional real estate agent, he had a duty to do so. Under Kansas law, a necessary element of fraud by silence is that defendants had an obligation to communicate material facts to plaintiff. See *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F.Supp.2d 1201, 1205 (D.Kan.2001). A duty to disclose arises in two situations: (1) a contracting party who has superior knowledge, or knowledge that is not within the reasonable reach of the other party, has a legal duty to disclose information material to the bargain; and (2) parties in a fiduciary relationship must disclose material information to one another. *Id.* (citing *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760, 576 P.2d 674, 679 (1978); *Denison State Bank v. Madeira*, 230 Kan. 684, 691–93, 640 P.2d 1235, 1241–42 (1982)). Whether a contractual or fiduciary duty to disclose exists is determined by the facts and circumstances of each indi-

vidual case. *Id.* (citing *Ensminger v. Terminix Int'l Co.*, 102 F.3d 1571, 1574 (10th Cir.1996)).

Plaintiff alleges that Bunting had superior knowledge and access to the information regarding the transaction, and that that information was not within her reasonable reach because she did not have a copy of the real estate contract. Bunting represented the sellers in the transaction, not plaintiff. The lack of a principal-agent relationship means that no contractual or fiduciary duties existed between Bunting and plaintiff. See *Stevens v. Jayhawk Realty Co., Inc.*, 9 Kan.App.2d 338, 344–45, 677 P.2d 1019, 1025 (1984) (seller's agent did not owe fiduciary duty to prospective purchaser). Real estate brokers do have a duty to the public, however, under K.S.A. §§ 58–3039, 3050 and 58–3062. *Id.* While not as broad in scope as a fiduciary duty, this duty necessitates that agents not engage in fraud or make any substantial misrepresentation. See K.S.A. 58–3062(a)(14). This duty includes statements made by seller's agents to prospective purchasers. See *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 609, 876 P.2d 609, 619 (1994) (purchasers' fraudulent misrepresentation and concealment claim failed when they acknowledged that sellers' agent was unaware of defects in home); *Lynn v. Taylor*, 7 Kan.App.2d 369, 372, 642 P.2d 131, 135 (1982) (seller's agent had duty to disclose to prospective purchaser that home had failed termite inspection). Although Bunting did not have a fiduciary relationship, as a real estate agent he did have a duty to not engage in fraudulent misrepresentation or concealment with a potential purchaser.

 Plaintiff's misrepresentation claim will fail, if she cannot prove that she justifiably relied on Bunting's misrepresentation or omission. Under Kansas law, the injured party's reliance must be "reason-

able, justifiable and detrimental." See *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F.Supp.2d 1164, 1198 (D.Kan.1999). In considering whether reliance is justifiable, the Kansas Court of Appeals held that:

> Many factors must be considered in determining whether a statement is a matter of fact or matter of opinion and whether or not a plaintiff has a right to rely on the statement. Among the facts the court will take into consideration are the intelligence, education, business experience and relative situation of the parties; the general information and experience of the persons involved as to the nature and use of the property; the habits and methods of those in the industry or profession involved; the opportunity for both parties to make an independent investigation as well as the nature, extent and result of any investigation so made; and any contract the parties knowingly and understandingly entered into.

*Goff v. Ame. Savs. Ass'n.*, 1 Kan.App.2d 75, 79, 561 P.2d 897, 901 (1977). It further held that "[a] recipient of a fraudulent misrepresentation is justified in relying upon its truth without investigation, unless he knows or has reason to know of facts which make his reliance unreasonable ... the test is whether the recipient has 'information which would serve as a danger signal and a red light to any normal person of his intelligence and experience.'" *Id.* at 82, 561 P.2d at 903 (citing Restatement (Second) Torts § 540 at 10 and comments to § 540 at 12.). The record reveals very little relevant information about the intelligence, education, business experience, and relative situations of the parties, the habits and methods of those in the residential real estate industry, or the opportunity for both parties to independently investigate the facts of the situation. It is undisputed that plaintiff was a first-time home buyer and Bunting was a professional real estate agent. Plaintiff asserts that her reliance on Bunting was justifiable because she did not have a copy of the real estate contract. Defendants counter that because plaintiff had a real estate agent, she could not justifiably rely on Bunting. On June 30, 1998, however, plaintiff had advised her real estate agent that she no longer wanted him to represent her. Thus, at the time Bunting made the alleged misrepresentation and omission, plaintiff was unrepresented. Viewing the limited record in the light most favorable to plaintiff, a jury might reasonably find that plaintiff was justified in relying on Bunting to explain the contract language. He was an experienced real estate agent and he accompanied his explanation with a threat of litigation if plaintiff did not acquiesce.

Despite defendants' argument that plaintiff has only set forth conclusory allegations, she has created a genuine issue of material fact whether Bunting and Countrywide are liable because Bunting fraudulently misrepresented that plaintiff was obligated to buy the home and fraudulently failed to disclose the fact that she was not required to do so. Furthermore, defendants' argument that plaintiff's claim cannot survive summary judgment because the terms of the transaction were fair and not different from any other real estate transaction is irrelevant. Summary judgment is not appropriate on this claim.

**2. Fraudulent promise to make home repairs and keep up home.**

Plaintiff's complaint alleges that Bunting fraudulently promised to make home repairs and take care of her home for her. See Amended Complaint (Doc. # 166) at 11, 29. Ordinarily, while misrepresentations relating to pre-existing or present facts are actionable, statements or promises about future occurrences are not. See *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152 (10th Cir.1994)

(citing *Edwards v. Phillips Petrol. Co.*, 187 Kan. 656, 659, 360 P.2d 23, 26 (1961)). An exception exists where evidence establishes that at the time the promise was made, the promisor did not intend to perform the promised action. *Id.* at 660, 360 P.2d 23. Where a claim of fraud is predicated on a promise or statement concerning future events, plaintiff must prove more than mere nonperformance to show fraudulent intent. See *Sithon Maritime Co. v. Holiday Mansion*, No. 96–2262–KHV, 1999 WL 156167, at *7 (D.Kan. Feb. 16, 1999) (citing *Whitten v. Farmland Indus., Inc.*, 759 F.Supp. 1522, 1542 (D.Kan. 1991) (citations omitted)). "The gravamen of such a claim is the existence of other circumstances of substantial character which support an inference of wrongful intent at the time of making the representation." *Id.* (citing *Whitten*, 759 F.Supp. at 1542 (citations omitted)).

Defendants argue that they are entitled to summary judgment because Bunting has provided an affidavit which states that he did not make any representations or misrepresentations regarding the property which plaintiff purchased. Plaintiff has provided a signed writing, however, in which Bunting promised to install a microwave and no later than July 10, 1998 to attach batt board. Nonetheless, plaintiff's claim cannot prevail. She has not shown that when he promised to do so, Bunting did not intend to timely complete the repairs or assist in keeping up her house. As noted above, plaintiff must prove more than mere nonperformance. Here, plaintiff cites no evidence of wrongful intent at the time the promises were made. Defendants are therefore entitled to summary judgment on this claim.

3. **Fraudulent misrepresentation and concealment of information relating to the property.**

■ Plaintiff alleges that Bunting fraudulently represented that the home had no other defects, and fraudulently failed to disclose that the home had a broken water pipe, no heat or air-conditioning, a damaged garage door and an outdated and leaky water heater. See Amended Complaint (Doc. # 166) at 13. In his affidavit, Bunting states that he "made no representations or misrepresentations whatsoever regarding the condition of the property [at issue]." Exhibit A in Defendants' Supporting Memorandum (Doc. # 114) at ¶ 11. This statement does not address plaintiff's theory that Bunting concealed information from plaintiff, and defendants are not entitled to summary judgment on plaintiff's claim of fraudulent concealment.

As to plaintiff's claim that Bunting represented that the property had "no other defects," defendants seek summary judgment because plaintiff purchased the property "as is" and bore the risk of any undisclosed defects and, as noted above, Bunting swears that he did not make any misrepresentations concerning the condition of the property. Regarding defendants' first argument, even if plaintiff purchased the home "as is," she would still have a fraud claim if Bunting made misrepresentations in order to induce her to sign the contract. As to defendants' second argument, Bunting's affidavit is unrefuted. He insists that he made no misrepresentations about the property. In plaintiff's affidavit, she swears that she asked Bunting about defects, but she does not disclose how he responded. Plaintiff only alleges that Bunting said that he would keep up the home for her. The crux of the fraud claim, however, is that Bunting misrepresented that the home had "no other defects." This allegation finds no support in the record, so plaintiff's claim must fail. Defendants are entitled to summary judgment on plaintiff's claim that Bunting fraudulently misrepre-

sented that the home had no other defects.

## D. Negligent Performance Of Voluntary Undertakings (Count II(D))

█ In her complaint, plaintiff alleges that defendants deliberately and voluntarily made statements about the real estate and by such statements assumed a duty to repair and maintain her property. Specifically, plaintiff alleges that Bunting said that he would install plaintiff's microwave and batt board, finish his repairs within 10 days of closing, aid and assist plaintiff in maintaining her house, and provide complete and authenticated information about plaintiff's home.[18] While plaintiff calls this claim "negligent performance of voluntary undertakings," it is more aptly characterized as negligent misrepresentation.

Defendants claim that they are entitled to summary judgment because (1) plaintiff fails to set forth facts to substantiate her conclusory allegations; (2) Bunting did not make any misrepresentations regarding the property or conceal the real estate contract; (3) Bunting did not coerce, harass, threaten or in any way force plaintiff to purchase the home; (4) plaintiff was represented by a real estate agent and could have canceled the contract at any time; and (5) plaintiff purchased the property "as is" and she bears responsibility for any problems that she discovered after the purchase.

█ As noted above, the elements of fraud are: (1) an untrue statement of fact; (2) known to be untrue by the party making it; (3) which is made with the intent to deceive or recklessly made with disregard for the truth; (4) where another party justifiably relies on the statement and

acts to his or her injury; and (5) damage. See *Albers*, 248 Kan. at 575, 809 P.2d 1194. The major difference between the torts of negligent misrepresentation and fraudulent misrepresentation is "that the latter requires proof that defendants knew the statement was untrue or were reckless as to whether the statement was true or false and the former merely requires proof that defendants failed to exercise reasonable care or competence to obtain or communicate true information." *Mahler*, 255 Kan. at 604, 876 P.2d 609 (quoting *Huttegger v. Davis*, 599 S.W.2d 506, 514 (Mo.1980)). The Kansas Supreme Court has specifically recognized that real estate agents can be held liable for negligent misrepresentations when they induce a buyer to purchase real estate based on a misrepresentation, even if innocently made. See *Mahler*, 255 Kan. at 605, 876 P.2d 609 (grant of summary judgment reversed for real estate agent who had passed along unverified information regarding home). The Kansas Supreme Court quoted with approval that "[a]ny other rule would permit brokers to use misleading statements in selling the property, yet remain immune from liability by simply remaining ignorant of the property's true characteristics." *Id.* (quoting *Bevins v. Ballard*, 655 P.2d 757, 763 (Alaska 1982)). The Court further said that "the question is whether the agent failed 'to exercise reasonable care or competence in obtaining or communicating the information.'" *Id.* at 606, 876 P.2d at 617 (quoting Restatement (Second) of Torts § 552(1)).

As an initial matter, defendants seek summary judgment on all of plaintiff's negligence claims against Wittmer, Bunting

---

**18.** Plaintiff's pleadings on this claim are not entirely clear. Regarding the installation claim, the Court assumes that plaintiff is alleging that Bunting said he would install the batt board and microwave. Plaintiff's exact language on this point is: "he made the following undertakings: (a) to install ... responsibility [sic]." Amended Complaint (Doc. # 166) at 31.

Appraisal Services, Robert Thomas and Candace Thomas because they had nothing to do with any alleged statements to plaintiff. Defendants' motion in this regard is well taken. All of plaintiff's negligence claims arise from promises which Bunting made before she purchased the home. Plaintiff does not allege that the other defendants promised her anything, or that they had any duty to make repairs. Although the alleged promises were to be completed after the transaction closed, Bunting's written agreement with plaintiff stated that the repairs would be "the responsibility of Marc E. Bunting." See Exhibit H in Plaintiff's Opposition Memorandum (Doc. # 126). Only Bunting, and through him perhaps Countrywide, are implicated in the actions that allegedly created a duty to plaintiff, and in the performance of the alleged duties. Defendants' motion for summary judgment is therefore sustained as to Wittmer, Bunting Appraisal Services, Robert Thomas and Candace Thomas.

Defendants also seek summary judgment because plaintiff purchased the home "as is." The contract, however, does not absolve Bunting of any obligation to perform the promises which induced plaintiff to purchase the home, i.e. to complete certain repairs, assist in the upkeep of the home and provide complete information regarding the home. Summary judgment is inappropriate for this reason.

Finally, defendants seek summary judgment because plaintiff's conclusory allegations are not sufficient to survive summary judgment, Bunting did not make any misrepresentations regarding the property, Bunting did not force plaintiff to purchase the home, and plaintiff, who was represented by a realtor, purchased the property despite the fact that she could have cancelled the contract.

■ Plaintiff alleges that to induce her to purchase the home, Bunting negligently promised to make repairs and assist her in maintaining her home. The Kansas Supreme Court has specifically stated that "the tort of negligent misrepresentation ... does not, by its own terms, apply to misrepresentation of an intention to perform an agreement." *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 221–22, 4 P.3d 1149, 1166–67 (2000) (statements that employer would treat employees fairly not actionable as negligent misrepresentation). The tort applies only to cases which involve misrepresentation of factual, commercial information, not to statements of future intent. See *id.* Under Kansas law, determining whether the alleged misrepresentations were of ones of present fact or ones of future intent is a question of law. See *Bittel v. Farm Credit Servs. of Cent. Kan.*, 265 Kan. 651, 665, 962 P.2d 491, 501 (1998) (statement that bank would continue financing constituted statement of future intent and could not support action for negligent misrepresentation). The alleged statements by Bunting pertain to his intent to perform future actions. Because these statements are of future intent, they are not actionable under the doctrine of negligent misrepresentation and summary judgment is appropriate on this ground.

■ Plaintiff's final allegation is that Bunting negligently failed to provide complete and authenticated information about her home. If Bunting had a duty to provide "complete and authenticated information" about plaintiff's home, it apparently arose from a promise (or representation) to plaintiff that he would do so; plaintiff does not cite a contractual, statutory or other source of his alleged duty. Bunting's affidavit, however, asserts that he did not make any representations or misrepresentations about the property. In her affidavit, plaintiff makes no claim that Bunting promised to provide complete and authenticated information regarding the

home. Because the record contains no competent evidence of such a promise, summary judgment is appropriate on this claim.

### E. Malicious Prosecution (Count II(E))

■ Plaintiff alleges that defendants maliciously prosecuted "the criminal trespass and harassment action" against her, Amended Complaint (Doc. # 166) at 33, in retaliation for the fact that she filed a HUD complaint.[19] This claim serves as a basis for plaintiff's Fair Housing Act retaliation claim and plaintiff also seeks common law relief on this basis.

As noted in Section I(B)(1) supra, to prove malicious prosecution under Kansas law, plaintiff must show that the earlier proceedings terminated in her favor. See *Bergstrom v. Noah*, 266 Kan. 829, 837, 974 P.2d 520, 526 (1999). Bunting's suit did not terminate in plaintiff's favor; the court awarded Bunting a restraining order and denied plaintiff's request for one. Defendants are therefore entitled to summary judgment on plaintiff's malicious prosecution claim.

### F. Intentional Infliction Of Emotional Distress (Count II(F))

Plaintiff states that the "acts of [d]efendants [described throughout her complaint] were done willfully, maliciously, outrageously, deliberately, and purposely with the intention to inflict emotional distress upon [p]laintiff and her child and/or were done in reckless disregard of the probability of causing [p]laintiff emotional distress." Amended Complaint (Doc. # 166) at 33. Plaintiff does not state which actions constitute intentional infliction of emotional distress. Defendants argue that they are entitled to summary

judgment on plaintiff's claim because she has not pointed to specific acts which constitute extreme or outrageous conduct, defendants did not engage in extreme or outrageous conduct or intend to inflict emotional distress on plaintiff, and plaintiff has not provided defendants any medical records which suggest that she has suffered emotional distress or bodily injury.

■ In order to prevail on a claim for intentional infliction of emotional distress, Kansas law requires plaintiff to demonstrate that (1) defendants' conduct was intentional or in reckless disregard of plaintiff; (2) defendants' conduct was extreme and outrageous; (3) a causal connection exists between defendants' conduct and plaintiff's mental distress; and (4) plaintiff's mental distress was extreme and severe. See *Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981). The Kansas Supreme Court has established two threshold requirements which must be satisfied, and which the Court must determine as a matter of law. *Id.* First, the Court must ascertain whether defendants' conduct may be reasonably regarded as so extreme and outrageous as to permit recovery. *Id.* If so, the Court then determines whether the emotional distress suffered by plaintiff is so severe that no reasonable person should be expected to endure it. *Id.* If plaintiff's claim fails either of these threshold requirements, the claim will not survive.

To declare that defendants' conduct may be regarded as "extreme and outrageous," the Court must conclude that defendants' behavior meets the following standard:

> Liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of

---

**19.** The record does not reveal that defendants instigated any criminal trespass action against plaintiff, and the Court assumes that plaintiff refers to Bunting's petition for a restraining order.

decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said that liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!" It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expression, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt ... Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

*Roberts,* 230 Kan. at 293, 637 P.2d at 1179.

As an initial matter, plaintiff has made no allegations that would support a claim of intentional infliction of emotional distress as to Bunting Appraisal Services and Wittmer.

■ Regarding Candace Thomas, plaintiff alleges that she essentially had two conversations in which Thomas stated that "[y]ou are good in getting a man," "[y]ou are a Chinese" and "[y]ou'd better to [sic] find a Chinese man in town" Plaintiff's Statement Of Uncontroverted Facts in Plaintiff's Opposition Memorandum (Doc. # 126) at ¶¶ 32, 35. Under Kansas law, these remarks may have been insensitive, but they were not outrageous.

■ As to Robert Thomas, plaintiff alleges only that on one occasion when she was in the Countrywide office, he approached her in a physically threatening manner, yelled at her to get out of the office immediately and told her that he would sue her, have the police arrest her and get her employer to fire her. Defendants do not deny that Thomas asked plaintiff to leave Countrywide, but state that he did so due to plaintiff's irrational behavior, which was unsuitable for a business environment. Plaintiff does not controvert this fact. Therefore, even if Thomas' reaction was disproportionate and uncalled for, it does not shock the conscience and he is entitled to summary judgment on this claim.

■ As to Bunting, plaintiff's amended complaint alleges that he coerced her into trading sex for home repairs and that he ultimately broke into her home and raped her. Viewing the record in the light most favorable to plaintiff, these facts shock the conscience. While defendants assert that plaintiff has not come forward with proof that she suffered emotional distress or bodily injury, plaintiff's doctor states that she has symptoms of post-traumatic stress disorder. See Exhibit M in Plaintiff's Opposition Memorandum (Doc. # 126). The Court cannot conclude as a matter of law that a reasonable person should be expected to endure emotional distress of this severity. Bunting is not entitled to summary judgment on this claim.

■ Plaintiff implicates Countrywide in Bunting's conduct because it is his employer. Generally, an employer is not liable for the intentional torts of an employee unless they are committed while the employee is acting within the scope of his employment or in furtherance of his employer's business, and not with a purpose personal to the employee. See *Williams v. Cmty. Drive–In Theater, Inc.,* 214 Kan. 359, syl. 3, 520 P.2d 1296 (1974). Plaintiff does not allege that Bunting's sexual activity was within the scope of his employment or in furtherance of his employer's business. Summary judgment is therefore ap-

propriate as to Countrywide, but not as to Bunting.

**IT IS THEREFORE ORDERED** that defendants' Motion For Summary Judgment (Doc. # 113) filed April 11, 2001 be and hereby is **SUSTAINED** in part. Specifically, all defendants except Bunting and Countrywide are entitled to summary judgment on Count I, which alleges that defendants violated the Fair Housing Act, 42 U.S.C. § 3617, and 42 U.S.C. § 1982. Bunting and Countrywide are not entitled to summary judgment on plaintiff's claim that Bunting retaliated against her for filing a HUD complaint in violation of 42 U.S.C. § 3617. Bunting and Countrywide are otherwise entitled to summary judgment on Count I.

As to Count II(A), which alleges fraudulent misrepresentation and concealment, Wittmer, Bunting Appraisal Services, Robert Thomas and Candace Thomas are entitled to summary judgment. Bunting and Countrywide are not entitled to summary judgment on plaintiff's claim that Bunting fraudulently misrepresented that plaintiff was obligated to buy the home and fraudulently failed to disclose the fact that she was not required to do so. Bunting and Countrywide are otherwise entitled to summary judgment on Count II(A).

As to Count II(D), which alleges negligent misrepresentation, all defendants are entitled to summary judgment.

As to Count II(E), which alleges malicious prosecution, all defendants are entitled to summary judgment.

As to Count II(F), which alleges intentional infliction of emotional distress, Countrywide, Wittmer, Bunting Appraisal Services, Robert Thomas and Candace Thomas are entitled to summary judgment. Plaintiff's motion is overruled as to Bunting.

Defendants' motion for summary judgment does not address plaintiff's claims that defendants violated state consumer protection statutes (Count II(B)), breached real estate broker's duties (Count II(C)), engaged in civil conspiracy (Count II(G)), and committed mail fraud in violation of RICO (Count III) and racketeering (Count IV).

**IT IS FURTHER ORDERED** that plaintiff's Motion To Strike The Deposition Transcript Of Xiangyuan (Sue) Zhu Attached To Defendants' Motion For Summary Judgment (Doc. # 140) filed May 21, 2001 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that all claims against Fisher, Cavanaugh, Smith & Lemon P.A. and Thomas G. Lemon be and hereby are **DISMISSED** with prejudice.